## NATIONAL RAILROAD PASSENGER CORPORATION

v.

## BOSTON AND MAINE CORPORATION, Appellant.

### No. 87–7190.

United States Court of Appeals, District of Columbia Circuit.

Argued April 21, 1988.

Decided June 24, 1988.

---

Charles Lee Eisen, Washington, D.C., with whom Kinga M. LaChapelle and John P. Cronin, North Billerica, Mass., were on the brief, for appellant.

Dennis M. Moore, with whom T. Michael Kerrine, Washington, D.C., was on the brief, for appellee.

Before RUTH BADER GINSBURG, D.H. GINSBURG and SENTELLE, Circuit Judges.

D.H. GINSBURG, Circuit Judge:

In 1977, the two parties to this case entered into an agreement containing a

broad arbitration clause. When a dispute between them arose in 1987, one sought arbitration and the other refused, claiming that the agreement, along with the arbitration clause, had expired. The district court, rather than deciding the question itself, held that it was for the arbitrators to determine whether the agreement had expired, and ordered the recalcitrant party to submit to arbitration on that question. We affirm.

## I. BACKGROUND

In 1977, the Boston and Maine Corporation ("B & M") entered into a written agreement with the National Railroad Passenger Corporation ("Amtrak"), authorizing Amtrak to operate its "Montrealer" train service over a section of track owned by B & M. Under the agreement, B & M was required to provide various services and facilities to Amtrak, and to maintain its track in such condition as to allow Amtrak's trains to operate over designated segments of it at not less than specified speeds. In return, Amtrak was to make periodic payments to B & M in accordance with a schedule set forth in the agreement.

Our concern in this case is with the relationship between two provisions of the agreement. One is the arbitration clause, which provides that "[a]ny claim or controversy between Amtrak and B & M concerning the interpretation, application or implementation of this Agreement shall be submitted to binding arbitration in accordance with the provisions of the Arbitration Agreement attached hereto...."[1] The other is the expiration clause, which states that "[t]his contract shall remain in full force and effect for two years, through January 31, 1979, unless terminated or modified by mutual consent of both parties, and thereafter until 90 days after written notice of cancellation by either party is received by the other."

In 1987, after several years of feuding with B & M over the condition of the track used for the Montrealer service, Amtrak initiated an arbitration proceeding against B & M, claiming that it had breached the agreement by failing properly to maintain several portions of its track. B & M, however, refused to submit to arbitration, arguing that the agreement had expired in 1981, and that it was therefore under no obligation to arbitrate. Amtrak, on the other hand, maintained that the agreement remained in effect, having been extended by numerous "Amendment Agreements" signed by both parties.

Thus, Amtrak petitioned the district court for an order compelling B & M to arbitrate the contract dispute in the pending arbitration proceeding. In the district court, B & M renewed its contention that the 1977 agreement had expired in 1981; since its expiration, B & M maintained, the parties had simply operated under an "informal arrangement." The parties filed cross-motions for summary judgment, Amtrak seeking a declaration that the arbitration clause continued to bind the parties, and B & M seeking a declaration that it did not. The district court, however, refused to determine the vitality of the arbitration clause after September 30, 1981; instead, it ordered B & M to submit to arbitration the question whether the 1977 agreement had expired. The court reasoned that this question had to be referred to arbitration because the arbitration clause itself "requires that each and every claim or controversy concerning the interpretation, application or implementation of the Agreement, including a dispute over the term of the contract, shall be submitted to arbitration." *National R.R. Corp. v. Boston & Maine Corp.*, No. 87–1507, slip op. at 6 (D.D.C. Aug. 31, 1987) [available on WESTLAW, 1987 WL 16842] (order granting summary judgment).

B & M moved the district court for a stay pending appeal to this court. In the memorandum accompanying its denial of that motion, the district court noted that B & M's motion had mischaracterized the court's decision as holding that "the ques-

---

**1.** The arbitration agreement referenced in the clause is "The National Railroad Passenger Corporation Arbitration Agreement," which provides for arbitration before a three-member panel of arbitrators known as the National Arbitration Panel or NAP.

tion of whether the parties agreed to arbitrate" is for the arbitrator. Its holding, the district court emphasized, was that by entering into "an expansive, nearly all-encompassing arbitration clause," the parties *had* agreed to arbitrate questions relating to the duration both of the contract itself and of its accompanying arbitration clause. *National R.R. Corp. v. Boston & Maine Corp.*, No. 87–1507, slip op. at 4 (D.D.C. Dec. 21, 1987) [available on WESTLAW, 1987 WL 33429] (order denying stay pending appeal).

## II. ANALYSIS

■ The principles that underlie our analysis of this case are long-established, and were recently reaffirmed in *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The "first principle" of arbitrability, the Supreme Court emphasized, is that " 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Id.* at 648, 106 S.Ct. at 1418 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). This principle recognizes that "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *Id.* It is a necessary corollary of the principle that "arbitration is a matter of contract" that when the parties *have* provided that a particular type of dispute should be settled in arbitration, rather than in litigation, a court may not override that agreement by itself deciding such a dispute.

The second principle restated in *AT & T Technologies* is that "the question of arbitrability—whether [an agreement] creates a duty for the parties to arbitrate [a] particular grievance—is undeniably an issue for judicial determination." *Id.* 475 U.S. at 649, 106 S.Ct. at 1418. In other words, the Court said, "[u]nless the parties clearly and unmistakably provide otherwise, the question of *whether* the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* (emphasis added).

### A.

■ At the heart of this case is the proper interpretation of this second principle. The parties agree, as they must, that because they have not "clearly and unmistakably" provided otherwise, "the question of *whether* the parties agreed to arbitrate" must be decided by the court, not by the arbitrators. They disagree, however, about the nature of the "particular grievance" over which the court must find that they agreed to arbitrate. B & M would have us view this case as a dispute over track maintenance. In order to decide whether the parties agreed to arbitrate that dispute, it argues, the court must decide (a) whether the contract, and the arbitration clause it contains, has expired. Amtrak, with the prompting of the district court, takes one step back before beginning its analysis. It notes that there is no real doubt that if the 1977 agreement is still in effect, then the underlying dispute over track maintenance must be submitted to arbitration. Therefore, it argues, the only question for the court is (b) whether B & M agreed to arbitrate disputes over the duration of the contract.

At first blush, either way of stating the issue seems plausible. Under B & M's view of the case, however, we are led to the following dilemma. If, as B & M argues, the question is whether the contract has expired, and if we assume for the moment that the answer is that it has not, then in view of the broad scope of the arbitration clause, this dispute over the proper interpretation of the contract should be decided by the arbitrators and not by the court. Therefore, if we remand the case to the district court, as B & M urges, and that court decides that the contract (with its arbitration clause) is still in effect, then it will have made a decision that the parties have agreed to submit to the arbitrators. Alternatively, if we refer to arbitration the question as B & M puts it, and if the arbitrators decide that the contract (along with its arbitration clause) has expired,

then they will have made a decision that was outside their contractual jurisdiction, a decision that they have no power to make. Clearly, something is amiss in B & M's approach.

The dilemma disappears, however, when we regress one step (as did the district court) and adopt Amtrak's starting point for the analysis. The relevant inquiry, then, is whether the parties, at the time they entered into the contract, intended that disputes over the duration of the contract would be decided by a court or by the arbitrators—i.e., whether they agreed to arbitrate disputes over contract expiration. B & M's response to this approach to the case is to suggest that the parties intended for such disputes to be resolved in arbitration only as long as the underlying contract was in effect; once the contract has expired, it claims, such disputes must be resolved by the courts. As is readily apparent, however, this argument leads immediately back to the difficulty we described above. That difficulty can be avoided only if the 1977 agreement is interpreted to yield determinate results: regardless of whether the substantive terms of the contract are currently in force, the arbitration clause either requires disputes over expiration of the contract to be submitted to arbitration or it remits such disputes to the courts.

### B.

Recalling the Supreme Court's "first principle" of arbitrability, that "arbitration is a matter of contract," we are mindful that our task is to discern the choice of the parties, not to make a choice of our own. We therefore turn to the contract to determine which of the two choices appears to be most faithful to the intent of the parties.

While B & M and Amtrak did not specifically state whether disputes over the expiration of their contract were to be arbitrated or litigated, they did provide that "[a]ny claim or controversy between Amtrak and B & M concerning the interpretation, application or implementation of this Agreement shall be submitted to binding arbitration. . . ." Amtrak argues that in interpret-

ing this provision, we should "adopt and enforce the strong federal policy favoring arbitration," which was reaffirmed by the Supreme court in *AT & T Technologies* as follows:

> where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steelworkers*, 363 U.S. at 582–83, 80 S.Ct. at 1352–53).

If this were our only guide to construing the 1977 agreement, our analysis would go no further, for the broad arbitration clause in that agreement is certainly "susceptible of an interpretation" that brings this dispute over contract expiration within its coverage. But we must also recognize the Supreme Court's underlying concern in *AT & T Technologies:* "The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be 'drastically reduced' [if the arbitrator] had the 'power to determine his own jurisdiction. . . .' " *Id.* 475 U.S. at 651, 106 S.Ct. at 1419–20 (quoting Cox, *Reflections Upon Labor Arbitration*, 72 Harv.L.Rev. 1482, 1509 (1959)). Similarly, if we allow the federal policy favoring arbitration, with its accompanying presumption of arbitrability, to override the will of the parties by giving the arbitration clause greater coverage than the parties intended, then in the longer run we risk undermining rather than serving that policy. In cases such as this one, for example, private parties may be reluctant to agree to arbitration if they believe that, despite their best efforts to express their wishes to the contrary, any slight ambiguity in their words or deeds can be seized upon to extend their obligation to arbitrate beyond the term of their contract. Therefore, mindful as we are of the federal policy in favor of arbitration, it is our task nonetheless to determine what

appears to be most consistent with the intent of the parties.

In making this determination, we distinguish on the basis of the following trichotomy among the disputes that arise in arbitrability cases. *Cf. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 v. Interstate Distributor Co.*, 832 F.2d 507, 509–10 (9th Cir.1987) (*"Local No. 70"*). First, there are disputes over the formation of an agreement to arbitrate—i.e., whether the parties ever agreed to submit anything to arbitration in the first place. *See, e.g., A.T. Massey Co. v. International Union, United Mine Workers of America*, 799 F.2d 142 (4th Cir.1986); *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51 (3d Cir.1980). In such cases, "the analysis is a simple one; if the parties disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute." *Local No. 70*, 832 F.2d at 510. Clearly, if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration.

The second and third types of recurring arbitrability disputes arise when the parties agree that, at one time, they entered into a valid arbitration clause, but disagree over the coverage of that clause. The area covered by an arbitration clause is the product of its breadth and its length. Thus, in our second category, there are disputes over the breadth of an arbitration clause, where the parties disagree over whether a certain issue falls within or without the subject matter coverage of an undoubted agreement to arbitrate. *See, e.g., AT & T Technologies*, 475 U.S. at 643, 106 S.Ct. at 1415; *Necchi v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693 (2d Cir.1965). As we noted above, the Supreme Court has held that it is generally for the courts to determine whether an arbitration clause is broad enough to cover a particular dispute. Unlike issues of formation, however, which must always be decided by the courts, the parties may agree to arbitrate questions of breadth.

The third type of arbitrability dispute, and the type before us in this case, relates to the length, rather than the breadth, of an arbitration clause. *See, e.g., Local No. 70*, 832 F.2d at 508; *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80*, 605 F.2d 1290 (2d Cir.1979). B & M suggests that this dispute over the duration of an arbitration clause is no different from a dispute over its formation, and therefore, that the court always has "a judicial responsibility to determine the *existence* of a present agreement to arbitrate"; or alternatively, that length questions should be treated like breadth questions, which may not be referred to arbitration (quoting *Necchi*, 348 F.2d at 696) "unless the arbitration provision is so unusually broad that it clearly vests the arbitrators with the power to resolve questions of arbitrability." [2] We disagree on both counts.

2. To illustrate these broad propositions, B & M relies upon *Massey*, 799 F.2d at 142; *I.S. Joseph Co. v. Michigan Sugar Co.*, 803 F.2d 396 (8th Cir.1986); and *Necchi*, 348 F.2d at 693. While in each case the court held that the district court was to decide the issue of arbitrability, none involved a question of contract duration. In *Massey*, the issue was whether, under the National Labor Relations Board's "single employer doctrine," all affiliated companies were bound by an agreement to arbitrate to which only one of the companies had agreed. Therefore, in the typology we have set out, *Massey* involved a question of contract formation, not of duration.

In *Joseph*, the issue, as stated by the court, was "whether a party to a commercial arbitration agreement can be compelled to arbitrate with the assignee of the entity with which it first agreed to arbitrate." 803 F.2d at 398. The court did not view the issue as whether the assignment had terminated the arbitration clause, but as whether the assignment—not just of the arbitration clause, but of the underlying contract—was valid. *Id.* at 400. There seems to have been no doubt that if the contract was assignable, then the parties were obligated to arbitrate according to its terms. If this case falls within any of the three categories of recurring arbitrability disputes, it is that of formation, in the sense that it involved a question whether the party resisting arbitration ever agreed to arbitrate with an assignee.

*Necchi* involved an arbitration clause that called for any dispute "arising out of or in connection with" the agreement to be submitted to arbitration. In that case, the party resisting arbitration claimed that certain disputes between the contracting parties did not arise out of, and were not connected with, the agreement containing the arbitration clause. Thus, the claim went to the breadth of the arbitration clause, not to its duration.

When there is an issue of formation, the court cannot be sure that the party resisting arbitration ever viewed the arbitrator as competent to resolve any dispute. In this case, however, B & M concedes that by entering into the 1977 agreement, it agreed to arbitrate a wide variety of potential disputes in the very forum before which Amtrak now wants it to appear. B & M apparently had confidence in that forum, and viewed it as a desirable place in which to resolve at least certain disputes it knew it might have with Amtrak.[3]

■ Questions of duration are also quite different from questions of breadth: parties' willingness to enter into an arbitration agreement should not be at all diminished by a rule referring to arbitration questions of duration that are fairly arguable. Questions of breadth are virtually infinite in variety, and it is difficult, if not impossible, for contracting parties to provide for each of them in advance. As the Supreme Court noted in *AT & T Technologies*, if we allow such questions to be arbitrated, then the willingness of parties to enter into arbitration agreements may be "drastically reduced" out of fear that arbitrators will tend to have an over-expansive view of their own jurisdiction. As to questions of length, however, the parties have it within their power to specify the date and hour at which their obligation to arbitrate is to end, or to specify a clear condition subsequent, such as sending of notice, giving any party the right to terminate that obligation. Where they have done so, there is nothing fairly arguable to refer to arbitration. Where they have not, the court performs its office of interpretation when it infers that they intended for the arbitrator to resolve the ambiguity.

■ Accordingly, we believe that the following general rules provide a sensible approach for resolving disputes, such as this one, over the expiration or termination of an arbitration clause. If the arbitration clause is a narrow one, covering only specified types of disputes (such as employee grievances), then we must presume that the parties did not intend for disputes over contract duration to be referred to arbitration. In such a case, the court will decide the question of duration unless the party seeking arbitration makes a clear showing that the contracting parties intended such disputes to be arbitrated. Faced with a somewhat broader arbitration clause, however, such as one providing generally (perhaps with certain specified exceptions) that disputes "arising under" or "concerning" the contract are to be arbitrated, we will presume that disputes over the termination or expiration of the contract should be submitted to arbitration. Of course, this presumption also attaches where the arbitration clause is broader still, such as one requiring arbitration of "any grievance affecting the mutual relations of the parties." *See Local No. 70*, 832 F.2d at 510 n. 2.

We recognize that there is no logical correlation between the breadth of an arbitration clause and its length; the narrowest possible clause could be intended by its authors to be permanent; and the broadest of clauses might be intended to last for only a short time. But here we are not directly concerned with the length of the arbitration clause. As we discussed above, the question before us is not whether the 1977 agreement is still in effect, but whether it is the court or the arbitrator that must decide that question, and we believe that the breadth of the arbitration clause does bear on the question of who must determine its length.

■ We also recognize that even a contract with a very broad arbitration clause is usually meant to have a finite duration, and that parties must be able effectively to provide for the expiration or termination of their obligation to arbitrate —including their obligation to arbitrate questions of contract duration. Therefore, even in cases involving very broad arbitra-

---

3. As we have mentioned, *supra* note 1, the 1977 agreement provides for arbitration before the NAP, a standing three-member arbitral panel. One of the NAP's members is designated by the freight railroads that are signatories to the National Railroad Passenger Corporation Agreement; one is selected by Amtrak; and the third is chosen by the other two members of the panel, or if they are unable to agree, by the Chief Justice of the United States.

tion clauses, the presumption in favor of arbitrating disputes over contract duration can be overcome by a clear showing that the parties intended for the underlying contract to expire, or separately agreed to terminate it, before the relevant dispute arose. For example, if a contract provides that "all disputes between the parties shall be arbitrated," but with equal clarity provides that it will expire on a date certain, then any dispute over whether the contract actually expired or was extended by the parties must be decided by the court rather than by the arbitrator. *Cf. Korody Marine Corp. v. Mineral & Chemicals Philipp Corp.*, 300 F.2d 124 (2d Cir.1962) (affirming per curiam trial court's determination that parties did not agree to renew a contract, which contained an arbitration clause, that expired by its own terms as of a specific date). Similarly, even if the contract contains no expiration date, if the party resisting arbitration makes a clear showing that the parties have agreed to terminate the agreement containing the arbitration clause (or even just the clause itself), then the court must decide the contract duration issue itself, rather than sending it to arbitration. *Cf. Rochdale Village*, 605 F.2d at 1296–97 (although contract provided that "any and all disputes hereunder" were to be arbitrated, the court must nevertheless decide whether the parties had terminated the contract by a separate agreement).

### C.

In light of these rules of interpretation, we see only two ways in which B & M might overcome the presumption, erected by the broad arbitration clause in this case, that this dispute over contract duration should be submitted to arbitration: either (1) by demonstrating that the original contract contains an unambiguous expiration date; or (2) by making a clear showing that the contract was properly terminated before this dispute arose.

As to the first possibility, however, it is clear that the 1977 agreement has no fixed expiration date. The termination clause in the original agreement provides that "[t]his contract shall remain in full force and effect for two years, through January 31, 1979, unless terminated or modified by mutual consent of both parties, *and thereafter until 90 days after written notice of cancellation by either party is received by the other.*" (Emphasis added.) In effect, now that January 31, 1979, has passed, the clause provides that the "contract shall remain in full force and effect until 90 days after written notice of cancellation by either party is received by the other."

B & M concedes, in fact, that the contract remained effective until September 30, 1981, but argues that two subsequent agreements had the effect of terminating it on that date. On February 1, 1979, the parties signed an "Amendment Agreement Change Record" specifically "[t]o extend the terms of the [1977 agreement] to September 30, 1979." That agreement did not contain a carry-over provision similar to the one in the original agreement, which we underscored above, but simply provided that "[t]his contract shall remain in full force through September 30, 1979, unless terminated or modified by mutual consent of both parties." In October, 1979, the parties signed another Amendment Agreement Change Record, which similarly provided that "[t]his contract shall remain in full force through September 30, 1981, unless terminated or modified by mutual consent of both parties." The October 1979 agreement, like the February 1979 agreement and unlike the 1977 agreement, did not contain a carry-over provision. Although the parties continued to sign Amendment Agreement Change Records after September 1981, none of them expressly extended the term of the 1977 agreement. Therefore, B & M argues, because the intervening agreements did not include carry-over provisions, the original agreement, and the arbitration clause in it, expired as of September 30, 1981.

We do not address the merits of B & M's contention,[4] but do note that there is a

---

4. The Supreme Court has specifically instructed that, "in deciding whether the parties have

agreed to submit a particular grievance to arbitration, a court is not to rule on the potential

contrary interpretation of these provisions that is also facially plausible: the contract extensions, first to 1979 and then to 1981, may be viewed as doing no more than establishing dates before which neither party could unilaterally terminate the contract. Under this view, the intervening agreements would have left the 1977 agreement intact "until 90 days after written notice of cancellation by either party is received by the other," and B & M does not claim to have given written notice of cancellation before Amtrak initiated the arbitration proceeding that B & M is resisting in this case.

In these circumstances, B & M is far from making a *clear showing* that the parties agreed, either in their original contract or by any novation, no longer to be bound by their original undertaking to arbitrate "any claim or controversy ... concerning the interpretation, application or implementation" of their agreement, including controversies over its duration.[5]

### III. SUMMARY

The district court properly framed the issue in this case as whether B & M and Amtrak agreed to arbitrate disputes concerning the duration of their 1977 agreement. Because the agreement contains a broad arbitration clause, requiring arbitration of all disputes concerning the meaning of the contract, we presume that the parties intended to arbitrate questions about its expiration or termination. B & M has not overcome this presumption either (1) by demonstrating that the contract contains an unambiguous expiration date, or (2) by making a clear showing that the contract had been otherwise terminated before the dispute arose. Accordingly, the district

merits of the underlying claims." *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1419.

5. B & M also contends that the district court erred in granting Amtrak's motion for summary judgment, inasmuch as there were genuine issues of material fact "regarding the existence of an agreement to arbitrate disputes arising after September 30, 1981." While the line between questions of fact and questions of law is sometimes indistinct, in this case that line is crystal

court's order compelling B & M to submit to arbitration is

*Affirmed.*

clear. The question of "the existence of an agreement to arbitrate" is purely a legal question, and involves no "genuine issues of material fact." The parties agree about the facts in this case—that they both signed certain agreements, and that they sent and received certain letters. As the district court determined when it entered summary judgment, they disagree only about the legal effect of those facts.