**LIBERTY UNIVERSITY, INC., Plaintiff,**

v.

**KEMPER SECURITIES GROUP, INC., et al., Defendants.**

**Civ. A. No. 90–0075–L.**

United States District Court, W.D. Virginia, Lynchburg Division.

Feb. 21, 1991.

---

Keith D. Boyette, Barry A. Hackney, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Va., Gregory G. Wille, Gibbs, Roper, Loots & Williams, Milwaukee, Wis., adm. pro hac vice, for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

In this diversity action the plaintiff, Liberty University, seeks damages arising from the defendants' negligent failure to underwrite and purchase and/or place or distribute $61 million in securities. The defendants' have moved for a stay of these proceedings and have requested that the Court refer the matter to arbitration as provided in the Investment Banking Agreement signed by the parties. The parties presented oral argument on this issue on January 16, 1991, and the matter is now ripe for disposition. For the reasons set forth below, I must deny the defendants' motion.

## BACKGROUND

In 1989, plaintiff Liberty University decided to purchase the University's main campus from Old Time Gospel Hour (Old Time), a company affiliated with Liberty University. Previously the main campus had been leased from Old Time. The purchase would be a 75 million dollar transaction, and was originally to be financed through tax-exempt bonds, however, the tax-exempt status of the bonds became the subject of extensive litigation, so Liberty decided to proceed with a taxable bonds offering.[1]

In 1990, Christian Mutual Life (CML), assisting Liberty with the taxable bond issue, introduced Liberty to the investment banking firm of Lovett Underwood Neuhaus & Webb. In April 1990, Lovett and defendant James A. Breslin, vice president and manager of the Structured Finance Department, began the process of putting together a 60 million dollar taxable bond offering, scheduled for completion on or

Norman Roy Grutman, Grutman Greene & Humphrey, New York City, adm. pro hac vice, Harwell M. Darby, Jr., Phillip R. Lingafelt, Glenn, Flippin, Feldmann & Darby, Roanoke, Va., William R. Carney, Warren C. Haskin, Bell, Boyd & Lloyd, Chicago, Ill, adm. pro hac vice, for plaintiff.

---

1. The Supreme Court of Virginia has since ruled that it would be unconstitutional to allow Liberty to finance the purchase with tax-exempt bonds.

before July 1, 1990. At that point, the defendants took over Liberty's overall debt restructuring plan. The engagement was formalized in an Investment Banking Agreement executed around April 20, 1990 by Liberty and Lovett. This agreement allegedly contained no arbitration provision. Christian Mutual Life wished to become a party to the agreement, so the agreement was redrafted to include CML. The arbitration provision was added at the request of CML; the final agreement was executed on May 25, 1990. Section IV.F of the May 25 Investment Banking Agreement contains the following arbitration clause:

> Any dispute under this Agreement shall be submitted to arbitration in the City of Concord, New Hampshire under the auspices of the American Arbitration Association (or such other organization as may be agreed among the parties) at the offices of Christian Mutual Life Insurance Company in Concord, New Hampshire. This contract shall be governed by the laws of the state of New Hampshire.

In the latter half of July, Lovett underwent a reorganization in which Lovett was merged into defendant Kemper Securities Group. After the merger, Lovett's investment banking services were assumed by defendant Kemper Capital Markets, a division of defendant Kemper Securities Group, Inc. The reorganization resulted in Lovett's dissolution on August 31. The date of Lovett's dissolution coincides with the date on which the Investment Banking Agreement was to terminate, August 31, 1990, unless extended upon written agreement by the parties. *See* § IV.D of the Investment Banking Agreement. There was no written extension of the agreement.

From September to November, 1990, the newly formed Kemper Capital Markets and defendant Breslin acted as Liberty's investment banker and continued to provide investment banking services. In preparation for the bond placement, Kemper contacted Duff & Phelps Credit Rating Co. to evaluate the bonds in order to obtain the required rating. In addition, Kemper participated in the preparation of a preliminary offering circular dated November 6, 1990.

Ultimately an Underwriting Agreement was drafted, but never executed. The agreement does not contain an arbitration provision.

Liberty contends that it was advised on September 24 that Duff & Phelps was proceeding to rate the bonds. As late as October 18, Duff & Phelps indicated that they would give a favorable rating. In September and October, Kemper and Breslin allegedly reported that preliminary market indications were positive. By November 1, Breslin indicated that he had found an investor who was willing to purchase the entire issue. The preliminary offering circular was dated and distributed on November 6, and by November 8, the parties were provided the Underwriting Agreement, which specified a November 15 closing.

Kemper denies that the parties entered an agreement other than the Investment Banking Agreement, noting that the Underwriting Agreement, attached as Exhibit D to the Complaint, is an unexecuted draft. According to Kemper, no underwriting agreement was reached because market reaction to the preliminary offering circular was adverse, so Kemper was unable to price the bonds on any basis consistent with the structure of Liberty's refinancing and the required Duff & Phelps rating. Some time after November 8, Kemper informed Liberty of the negative market reaction and Kemper's inability to conclude an underwriting agreement or a bond purchase agreement. On November 20, Kemper sent Liberty a letter discussing alternate marketing strategies, however, Liberty elected not to pursue the alternate strategies and instead brought this action on December 3, 1990.

## DISCUSSION

 The defendants have moved pursuant to 9 U.S.C. § 3 to stay these proceedings and refer the matter to arbitration. Arbitrability is fundamentally a matter of contract; a party cannot be required to arbitrate a dispute which he has not agreed to arbitrate. Whether an agreement creates a duty for the parties to arbitrate a

particular dispute is to be decided by the Court rather than an arbitrator, unless the parties clearly and unmistakably provided otherwise. *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). In addition, the burden is on the moving party to show that the dispute is subject to arbitration. *Nederlandse Erts–Tankersmaatschappij, N.V. v. Isbrandtsen Co.,* 339 F.2d 440 (2d Cir.1964). With these principles in mind, I must determine whether Liberty's grievances fall within the scope of the arbitration clause in the May 25, 1990 Investment Banking Agreement. In answering that question, I will employ the helpful analysis set forth by Judge Douglas Ginsburg in the factually similar case of *National R.R. Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d 756 (D.C.Cir.1988).

In *National R.R.,* Amtrak had contracted with B & M in 1977 to operate its "Montrealer" train service over a section of track owned by B & M. In 1987, after a long dispute over the condition of the track, Amtrak initiated an arbitration proceeding under the contract. B & M argued that the contract had been terminated in 1981; Amtrack maintained that the agreement had been extended by agreements signed by both parties. In deciding whether the parties intended the issue to be arbitrated, Judge Ginsburg distinguished three types of arbitration disputes: those concerning the formation of an agreement to arbitrate; those concerning the breadth of an arbitration clause (i.e., whether a dispute falls inside or outside the clause); and those involving the duration of the arbitration clause.

### A.

In the instant case, as in *National R.R.,* it is clear that the parties at one time intended to submit their disputes to arbitration. However, the Investment Banking Agreement by its own terms expired on August 31, 1990. Therefore, I am faced with a duration problem; did the arbitration clause remain effective after the expiration date of the Investment Banking Agreement? As an initial matter, I must determine whether this question is properly resolved by the Court or by an arbitrator.

*National R.R.* sets forth a useful set of guidelines for discerning the intent of the parties on this issue. The question of whether the parties intended disputes as to the duration of the clause to be subject to arbitration is presumed to be a question for the Court rather than an arbitrator, unless the parties have clearly indicated otherwise. *AT & T Technologies, supra.* Narrowly drawn arbitration clauses create a presumption that the parties did not intend disputes over duration to be referred to arbitration. Broader arbitration clauses, "such as ones providing generally ... that disputes 'arising under' or 'concerning' the contract are to be arbitrated" give rise to the presumption that disputes over termination of the contract should be submitted to arbitration. However, the presumption created by a broadly drafted arbitration clause can be overcome by demonstrating that the original contract contains an unambiguous expiration date. 850 F.2d at 762–63.

Applying these guidelines to the instant case, the broad language of the arbitration clause in the Investment Banking Agreement, "[a]ny dispute under this agreement," creates a presumption that disputes as to the duration of the clause must be resolved by an arbitrator. However, the unambiguous expiration date in the contract, August 31, 1990, rebuts the presumption in favor of arbitration, therefore the issue of duration is properly decided by the Court.

### B.

The defendants make several arguments in support of their contention that the arbitration clause lived on after the death of the contract. According to the defendants, Liberty's duty to arbitrate survived the termination of the agreement because the parties continued the investment banking relationship which was grounded in the Investment Banking Agreement. In support of this contention, the defendants cite several cases where termination of the contract did not affect the enforceability of arbitration

provision. *See, e.g., Nolde Bros. Inc. v. Local No. 358, Bakery & Confectionery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977).

■ The defendants are certainly correct that arbitration clauses remain in effect after the termination of a contract as to matters occurring prior to the termination of the contract or subject to the obligations of the contract. However, the instant case does not fall into either of those two categories. Liberty contends that after the termination of the Investment Banking Agreement, the parties embarked on the formation of the new contract which was ultimately memorialized in the unexecuted Underwriting Agreement, which contains no arbitration clause. It is significant that the arbitration clause was added to the Investment Banking Agreement only at the request of Christian Mutual Life, however, CML was not to be a party to the Underwriting Agreement. In addition, the present dispute arose in November of 1990—over three months after the expiration of the Investment Banking Agreement. Given these facts, it is clear that the Underwriting Agreement more closely represented the intentions of the parties in November than did the Investment Banking Agreement.

The defendants contend, however, that even if the parties did enter into a new oral agreement or a series of new oral agreements after the expiration of the Investment Banking Agreement, the arbitration clause of the Investment Banking Agreement is still applicable. This is so says the defendants because any agreements entered after the expiration of the Investment Banking Agreement merely implement or supplement the Investment Banking Agreement. In support of this argument, the defendants rely principally on *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315 (4th Cir.1988).

In *J.J. Ryan,* Ryan contracted to be the exclusive importer and distributor of certain products manufactured by Rhone affiliates. Subsequently, Rhone wanted its affiliates to distribute their products themselves, so Rhone attempted to purchase Ryan. After a dispute arose in the purchase negotiations, Rhone threatened to terminate the exclusive distribution agreements. When Ryan responded by filing suit, Rhone moved to dismiss, arguing that the dispute was covered by the arbitration contracts in the distribution agreements. Ryan argued that the arbitration clause did not cover matters outside the distribution contracts such as the importation of products, Ryan's compensation and the affiliates' security interests. These were subject to separately negotiated agreements which did not contain arbitration clauses. The Fourth Circuit upheld the district court's finding that disputes as to these matters were subject to arbitration since the separate agreements merely implemented the distribution agreement.

This reasoning seems inapplicable to the present dispute. Once again the approach taken in *National R.R.* is useful in analyzing these cases. In *J.J. Ryan,* there was a dispute as to the breadth rather than the duration of the arbitration clause. It was clear that the clause had not expired; it was not clear whether the clause extended to the ancillary agreements. In the instant case, the defendants must first show that the agreement has not expired—a duration problem. If the defendants wish to argue that the arbitration clause still applies, they must demonstrate that the Investment Banking Agreement was somehow modified and extended; it is not possible to implement and supplement a contract that has expired. However, as I indicated above, the defendants have been unable to show that the Investment Banking Agreement was extended.

Throughout their briefs and during oral argument before the Court, the defendants placed heavy emphasis on the strong federal policy in favor of arbitration. *See, e.g., Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). I am not unmindful of this policy, however, I may not force the plaintiffs to arbitrate a dispute when they have not agreed to arbitration. Having found no merit in the defendants' arguments that the arbitration clause survived the termi-

nation of the Investment Banking Agreement, I must deny their motion to stay these proceedings and refer Liberty's claims to arbitration.

## ORDER

For the reasons stated in the Memorandum Opinion filed contemporaneously herewith, it is hereby ADJUDGED and ORDERED that the defendants' motion to stay the proceedings and refer the action to arbitration is DENIED; the Court's Order of December 27, 1990 is VACATED to the extent that it stayed discovery in this action; the parties may proceed with discovery to the extent allowed by the Federal Rules of Civil Procedure.