**INSTITUT PASTEUR, Plaintiff,**

v.

**CHIRON CORP., Defendant.**

**No. CIV.A. 03–0932(JDB).**

United States District Court,
District of Columbia.

March 29, 2004.

Edward T. Colbert, Albert J. Breneisen, Christopher Lee Ogden, Richard Stephen Gresalfi, Kenyon & Kenyon, Washington, DC, for Plaintiff.

Matthew I. Kreeger, Rachael Krevans, Stephen Michael Colangelo, Will B. Fitton, Morrison & Foerster, LLP, San Francisco, CA, for Defendant.

## MEMORANDUM OPINION

BATES, District Judge.

Plaintiff Institut Pasteur ("Pasteur") brings this action under 35 U.S.C. § 146 to review certain decisions of the Board of Patent Appeals and Interferences of the United States Patent Trademark Office. Defendant Chiron Corporation ("Chiron") prevailed in a patent interference against Pasteur's predecessors in interest regarding a disputed test for HIV antibodies. Chiron has moved to stay these proceedings and compel arbitration, citing an HIV Cross–License Agreement of 1993 ("the Agreement"), signed by Pasteur and Chiron, that arguably requires submission of this dispute to binding arbitration. Pasteur insists that it joined the Agreement for limited purposes only and did not bind itself to the provision of the Agreement compelling arbitration. Also before the Court is Chiron's motion seeking relief from its obligations under FED. R. CIV. P. 26(f) during the pendency of the motion to compel arbitration.

## BACKGROUND

Pasteur is a private non-profit medical research foundation established under the laws of France. Chiron is a biotechnology company specializing in vaccines, blood

testing, and biopharmaceuticals. It is incorporated in Delaware and has its principal place of business in California.

The cross-license agreement states that it was "made by and among Chiron ... Ortho Diagnostics Systems, Inc., a New Jersey Corporation ('Ortho'), Pasteur Sanofi Diagnostics, a corporation formed under the laws of France ('PSD'), and Genetic Systems Corporation, a Delaware Corporation ('GSC')." Agreement at Preamble. It further states that Pasteur "joins in this Agreement for the purposes set forth herein." *Id.* Chiron and Ortho were at the time of the Agreement engaged in a long-term collaborative research venture involving the products subject to the Agreement. PSD and GSC each owned or controlled patents to HIV tests very similar to those developed by Chiron and Ortho. An underlying purpose of the Agreement, therefore, was the desire of PSD and GSC on the one hand and Ortho and Chiron on the other "to provide each other with freedom of operation under their respective patent rights, and thereby to avoid the possible mutual blocking of their patent rights and the uncertainty and expense of potential patent disputes." *Id.* at Background ¶ 4. Accordingly, Ortho and Chiron granted to PSD and GSC nonexclusive licenses under certain Ortho and Chiron patents to manufacture and market potentially disputable HIV products in specified countries. *Id.* at §§ 2.1, 2.2. In return, PSD and GSC granted to "the Ortho/Chiron parties" nonexclusive licenses under PSD and GSC patents [1] to manufacture and market similar HIV products in other countries. *Id.* at §§ 2.3, 2.4.

In Section 2.8 of the Agreement, "[t]o further ensure complete freedom of operation hereunder," Pasteur granted to the Ortho/Chiron parties an option to obtain a license as to some patents held directly by Pasteur under certain circumstances. *See id.* §§ 2.8.1, 2.8.2. "Except as set forth herein," the Agreement states, "such license from Institut Pasteur shall be subject to the same use limitations, terms and conditions as the licenses granted hereunder to the Ortho/Chiron Parties by PSD and GSC." *Id.* at § 2.8.1. The Ortho/Chiron parties agreed to pay royalties directly to Pasteur for any licenses granted under Section 2.8. *Id.* Finally, "[f]or the avoidance of doubt, PSD, GSC, and Institut Pasteur further agree[d] not to assert (or assist others in asserting) against the Ortho/Chiron Parties, solely with respect to their activities that are licensed under Sections 2.3 and 2.4, any patent rights specifically relating to HIV–1 and/or HIV–2, if any, that are not otherwise provided for under this Agreement." *Id.* at § 2.8.3.

A similar concern with warding off disputes is apparent in Sections 6.3 and 9.10 of the Agreement. In the former section, it was agreed that:

> The parties shall cooperate reasonably to resolve and withdraw from any patent interferences, and withdraw from any patent oppositions, between them with respect to Licensed Ortho/Chiron Patents owned by Ortho, Chiron or their Affiliates or Licensed PSD/GSC Patents owned by PSD, GSC or their Affiliates, or Institut Pasteur, to the extent the coverage of claims involved in such interference or opposition is limited to the uses licensed under this Agreement.

---

1. Section 2.5.2 of the agreement notes that PSD was an exclusive licensee of certain Pasteur patents: "For the avoidance of doubt, the parties acknowledge that the Licensed PSD/

GSC Patents include, without limitation, such Improvement Technology patent rights owned by Institut Pasteur." *Id.*

*Id.* at § 6.3.[2] Substantiating the Agreement's concern for cooperation, Section 9.10 outlines a dispute resolution procedure at some length. Section 9.10.1 provides:

> The parties recognize that bona fide disputes as to certain matters may arise from time to time. In the event of the occurrence of such a dispute, either party may, by written notice to the other party, have such dispute referred to the respective officers designated below or their successors, for attempted resolution by good faith negotiations within 30 days after such notice is received. The designated officers for Chiron and Ortho are their respective Presidents or Chairmen; the designated officers for GSC and PSD are their respective Presidents or Chairmen. In the event the designated officers are not able to resolve the referred dispute within the 30–day period, either party may invoke the provisions of Section 9.10.2 within 15 days following the 30–day period.

*Id.* Section 9.10.2 provides, in turn, that "[a]ny dispute, controversy or claim arising out of or relating to the validity, enforceability or performance of this Agreement shall be settled by binding Alternative Dispute Resolution ('ADR') in the manner described" in the succeeding nine subsections. *Id.* However, the Agreement acknowledges that some disputes related to its subject matter will not be subject to ADR. Section 9.10.6 states that "[n]othing in this Section 9.10 shall be deemed to preclude a party from bringing suit against the other party in a court of competent jurisdiction to enforce, or enjoin infringement of, such parties intellectual property rights." *Id.*

Finally, Section 9.15 states: "Institut Pasteur, by executing this Agreement, hereby signifies its consent to the terms hereof, agrees to the provisions of Section 2.8, and agrees to take no action which would have the effect of frustrating this Agreement." *Id.* The words "For Approval and as to Section 2.8" appear above the signature block for Pasteur.

## *ANALYSIS*

### A. Applicable Legal Standards

The parties do not dispute the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), to Chiron's motion. In relevant part, the FAA provides: "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction ... of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* at § 4. Further, "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement .... If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof." *Id.*

■ The Supreme Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United*

---

**2.** The section further provides: "In addition, under a separate agreement of even date herewith, Chiron and Institut Pasteur have agreed to work expeditiously toward the withdrawal of their oppositions and/or potential oppositions against each other's patent rights specifically relating to HIV–1 and/or HIV–2." That agreement was ultimately not executed.

*Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see also Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). While the courts have adhered to a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), the question whether the parties have submitted a particular dispute to arbitration is "an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also National R.R. Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d 756, 761 (D.C.Cir.1988).

■ "[T]he proper approach to employ in reviewing the defendant's motion to dismiss and compel arbitration is to apply the same standard of review that governs [Federal Rules of Civil Procedure] Rule 56 motions." *Brown v. Dorsey & Whitney, LLP,* 267 F.Supp.2d 61, 67 (D.D.C.2003). Thus, it is appropriate to grant a party's motion to compel arbitration when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking to compel arbitration bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. *Id.* at 252, 106 S.Ct. 2505. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. " 'The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise . . . . [I]nasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate,' consideration of the motion according to the 'standard used by district courts in resolving summary judgment motions pursuant to Fed.R.Civ.P. 56(c) . . . is appropriate.' " *Brown,* 267 F.Supp.2d at 66–67 (quoting *Par–Knit Mills v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 (3d Cir.1980)); *see also Smith Wilson Co. v. Trading & Dev. Establishment,* 744 F.Supp. 14, 16 (D.D.C.1990).

■ Chiron also seeks the entry of an order staying discovery. The decision whether to stay discovery lies in the sound discretion of the district court. *White v. Fraternal Order of Police,* 909 F.2d 512, 517 (D.C.Cir.1990). Accordingly, "[i]t is well settled that discovery is generally considered inappropriate while a motion that would be thoroughly dispositive of the claims in the Complaint is pending." *Anderson v. United States Attorney's Office,* 1992 WL 159186, at *1 (D.D.C. Jun.19, 1992).

### B. Agreement to Arbitrate

■ Begetting the central difficulty in this case, the Agreement does not define

the terms "party" or "parties" so as to resolve the question whether Pasteur is a party fully bound to the relevant provisions of the Agreement, including the arbitration clause at Section 9.10.2. The difficulty is compounded in the dispute resolution provisions of the Agreement, discussed *supra,* in which it is unclear at times whether the parties *to the Agreement* or the parties *to a dispute* are contemplated. A definition of "parties" that would encompass all signatories to the Agreement seems appropriate, however, in light of Section 9.6 "No Third Party Beneficiaries." That section provides:

This Agreement is entered into solely for the benefit of the parties hereto, and the provisions of this Agreement shall be for the sole and exclusive benefit of such parties. Nothing herein contained will be deemed to create any third party beneficiaries or confer any benefit or rights on or to any person not a party hereto, and no person not a party hereto shall be entitled to enforce any provisions hereof or exercise any rights hereunder.

*Id.* Pasteur does not dispute that the Agreement inures to its benefit or that it has exercisable rights thereunder. Nor, indeed, does it argue before this Court that the substantive claims of its action under 35 U.S.C. § 146 are beyond the scope of the Agreement. Hence, Pasteur must be a party to the Agreement as contemplated by Section 9.6. Nonetheless, Pasteur contends forcefully that it was not a party specifically to the dispute resolution provisions of the Agreement and that it therefore made no agreement to submit the present dispute to arbitration.

The Agreement does, in fact, treat Pasteur somewhat differently from the other signatories. Thus, Pasteur points to several provisions of the Agreement that appear to contemplate only Ortho, Chiron, PSD, and GSC as parties. For example, Section 9.10.1 identifies no officer at Pasteur to whom potential grievances under the voluntary dispute resolution scheme should be addressed. Section 6.3 discusses Pasteur's and Chiron's unexecuted agreement to withdraw patent disputes separately from the agreement of the other signatories to "cooperate reasonably to resolve and withdraw from any patent interferences, and withdraw from any patent oppositions." *Id.* And most of all, Pasteur distinguishes its stated intent to *agree* to Section 2.8 of the agreement from its mere *consent* to the remainder of the Agreement. *See id.* at § 9.15 & signature block. Pasteur points out that it joined the Agreement only "for the purposes set forth [there]in." *Id.* at Preamble. Such a caveat would be rendered meaningless, says Pasteur, if the Court were to find that Pasteur joined the Agreement in all respects.

Chiron replies that Pasteur's explicit agreement to Section 2.8 cannot be read to exclude an agreement to the dispute resolution provisions. Responding specifically to the differences in treatment identified by Pasteur, Chiron notes that, while no Pasteur officer is designated to receive notices in Section 9.10.1, that provision deals with a voluntary and informal dispute resolution mechanism apart from Section 9.10.2, which contains no language limiting the obligation to engage in ADR to a subset of the Agreement's signatories. As to Section 6.3, Chiron notes that the patent at issue in this case is a "licensed patent" as provided in the section's first sentence; Chiron's and Pasteur's failure to reach a separate agreement does not, says Chiron, speak to the underlying substantive controversy. Further, Chiron argues that various other miscellaneous provisions in the Agreement dealing with the manner in which parties may enforce their rights certainly apply to Pasteur,

and thus the arbitration provision at Section 9.10.2 should as well. For instance, "[a]ny notice, report, demand, or other communication required or permitted by [the] Agreement" is to be sent to Pasteur at its address provided in Section 9.2.[3] Chiron also emphasizes that the manner in which Pasteur receives royalties pursuant to Section 2.8 is dictated by Section 4, "Payment." Def.'s Rep. at 5. By analogy, says Chiron, the rights and obligations undertaken by Pasteur in Section 2.8 cannot be severed from the Section 9.10.2 obligation to use ADR. Finally, Chiron argues that, under Pasteur's reading of the Agreement, "disputes among the signatories arising out of the Agreement, even Section 2.8, would have to be resolved before different tribunals (potentially applying different law) depending on which parties were involved." Def.'s Rep. at 6.

The course of conduct between the parties sheds little light on the issue. Pasteur notes that Chiron appealed a European Patent Office ruling as to one of Pasteur's licensed patents under the Agreement in 1995. Pl.'s Opp. at 7. Pasteur concedes that Chiron ultimately withdrew that appeal, but argues that "by continuing the opposition in the EPO until that time, Chiron itself acknowledged that the first sentence of Section 6.3 does not relate to disputes between Institut Pasteur and Chiron." *Id.* Conversely, Chiron points to two memoranda it received from Pasteur in which the Agreement is identified as the "HIV Cross License Agreement between [or among] Chiron Corporation / Ortho Diagnostics Systems, Inc. / Pasteur Sanofi Diagnostics / Genetic Systems Corporation / Institut Pasteur." This listing, however, seems to be a very thin reed to support

Chiron's argument that Pasteur was, in fact, a party to the arbitration provision.

In the end, neither party has advanced an interpretation of the Agreement that would render it internally consistent as a whole. As to the precise question presented—whether Pasteur agreed to arbitrate any disagreements arising under the Agreement—the Court is simply not "satisfied that the making of the agreement for arbitration ... is not in issue" in this case. 9 U.S.C. § 4. Clearly Pasteur intended to be bound by some, but not all, of the Agreement's provisions. In light of Pasteur's insistence that it did not mean to be bound by the arbitration provisions, supported by its plausible reading of Section 9.15, Chiron's attempt to imply Pasteur's agreement to Section 9.10.2 does not succeed in taking the existence of an arbitration agreement out of contention. Chiron has not yet, for instance, supplied some sensible theory of the Agreement which would limit Pasteur's obligations to some subset of those undertaken by the other signatories, including the obligation to arbitrate. Chiron's best argument, that the Agreement expressly provides that it shall have no third party beneficiaries, does not dispel the Court's sense that the plain language of the Agreement reflects an intent to cabin Pasteur's obligations in some fashion, even if it is a "party" to the Agreement. Thus, because it is not clear beyond genuine dispute that there was a meeting of the minds between Chiron and Pasteur on an agreement to arbitrate, Chiron's motion cannot succeed at this point. *See Brown*, 267 F.Supp.2d at 66–67. Instead, having concluded that "the making of the agreement for arbitration" between Pasteur and Chiron is "in issue," the Court

---

**3.** This provision is ultimately of little help to Chiron, as Johnson & Johnson and Elf Sanofi—clearly not parties to the Agreement—are also listed as entities to whom notice should be sent. *See id.*

must conduct further proceedings to determine the issue. *See* 9 U.S.C. § 4.

### CONCLUSION

In light of the foregoing, Chiron's motion to compel arbitration shall be denied and its motion for relief from its discovery obligations shall be denied as moot. Consistent with the FAA, given the Court's conclusion that the existence of an arbitration agreement is at issue, the Court must "proceed summarily to the trial" of the existence of an agreement to arbitrate. 9 U.S.C. § 4. Accordingly, the parties shall confer and submit a proposal and schedule for further proceedings to resolve that issue by not later than fifteen (15) days from the date of this memorandum opinion. A separate order shall be issued herewith.

### ORDER

Upon consideration of defendant's motion to compel arbitration and defendant's motion for relief from its obligations under FED. R. CIV. P. 26(f), and for the reasons stated in the memorandum opinion issued on this date, it is hereby

ORDERED that defendant's motion to compel arbitration is denied without prejudice; and it is further

ORDERED that defendant's motion for relief from its FED. R. CIV. P 26(f) obligations is denied as moot; and it is further

ORDERED that the parties shall confer and submit a proposal and schedule for further proceedings to resolve the issue whether there was an agreement to arbitrate between plaintiff and defendant by not later than April 13, 2004.