Patricia Russell BROWN, Plaintiff,

v.

DORSEY & WHITNEY,
LLP, Defendant.

Civil Action No. 03–0031 (RBW).

United States District Court,
District of Columbia.

June 12, 2003.

Jimmy A. Bell, Upper Marlboro, MD, for Plaintiff.

Diana Lynn Embrey and Barbara Louise Johnson, Paul, Hastings, Janofsky & Walker, LLP, Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

This case involves a race discrimination claim brought by the plaintiff, Patricia Russell Brown, against her former employer, Dorsey & Whitney, LLP ("Dorsey"). Currently before the Court is the defendant's Motion to Dismiss and Compel Arbitration [# 8, # 12], which is opposed by the plaintiff.[1] For the reasons set forth below, the Court concludes that plaintiff must submit her claims to binding arbitration in accordance with the Employment Agreement she signed.

### I. Factual Background

Patricia Russell Brown is an attorney who was formerly employed by the defendant law firm. Plaintiff is a graduate of Princeton University, where she received a Bachelor of Science in Chemical Engineering, and Harvard University, where she obtained her law degree. Compl. ¶ 4.[2] Prior to joining Dorsey, plaintiff was em-

---

1. Defendant filed its motion to dismiss on February 2, 2003. Thereafter, on February 7, 2003, the Court granted plaintiff's motion for leave to file an amendment to her complaint, which plaintiff filed on February 14, 2003. On February 20, 2003, defendant filed a renewed motion to dismiss directed at the second amended complaint, in which it stated that the amended complaint, which corrected "nonsubstantive typographical errors ... had

no effect on Defendant's pending Motion to Dismiss and Compel Arbitration." Renewed Motion to Dismiss and Compel Arbitration in Response to Plaintiff's Second Amended Complaint at 1.

2. References to "Compl." are to the Second Amended Complaint filed by plaintiff on February 14, 2003.

ployed by two separate law firms; she worked at the first firm for a period of approximately five years and at the second firm for approximately two years. Defendant's Reply Memorandum in Support of Defendant's Motion to Dismiss and Compel Arbitration ("Def.'s Reply"), Exhibit ("Ex.") A (Resume of Patricia Russell Brown). Plaintiff was hired by Dorsey "[o]n or about October 16, 2000 . . . as an associate attorney to manage the trademark prosecution practice in [Dorsey's] Washington, D.C. office." Compl. ¶ 8. Plaintiff has filed this lawsuit against Dorsey for alleged racial discrimination in violation of 42 U.S.C. § 1981 (2000) and the D.C. Human Rights Act ("DCHRA"), D.C.Code §§ 2–1401.01–2–1411.06 (2001). She alleges that she was the victim of racial discrimination as "the only African–American female manager in the [defendant's] trademark group[ ]" and she contends that she was made "responsible for performing the duties of a legal assistant" in addition to the duties of an associate without receiving "any additional compensation." *Id.* ¶¶ 11, 13. Plaintiff seeks to recover compensatory damages, punitive damages, as well as damages for lost income, pre-and post-judgment interest, and attorney's fees. *Id.* ¶¶ 51–55.

## A. The Parties' Arguments

Defendant contends that this case should be dismissed because plaintiff is required to submit her claims to arbitration. Defendant does not challenge in its dismissal motion the validity of Brown's allegations of discrimination; it simply argues that any dispute that Brown has with Dorsey must be submitted to binding arbitration. This, it argues, is the result called for by the Employment Agreement[3] that

Brown signed when she joined the firm. Specifically, the Employment Agreement provides, in part:

11. You agree to be bound by the policies of the Firm, as adopted from time to time, including our dispute resolution policy. Additional information concerning these policies will be provided when you begin employment. In the meantime, if you wish to receive a copy of the dispute resolution policy, let me know.

Defendant's Memorandum in Support of Defendant's Motion to Dismiss and Compel Arbitration ("Def.'s Mem."), Ex. A (Declaration of Joan Oyaas, Chief Organization Development Officer for Dorsey & Whitney dated January 28, 2003) ("Oyaas Decl."), Ex. 2 (Employment Agreement signed by Patricia Brown on September 26, 2002).

The part of Dorsey's dispute resolution policy that Dorsey claims is applicable to Brown is entitled "Dispute Resolution Policy for Support Staff and Non–Partner Lawyers." It provides, in pertinent part:

As a condition of employment, any claims or disputes of any nature between an employee and the firm or any of its partners or employees shall be resolved exclusively by arbitration before the American Arbitration Association in Minneapolis, Minnesota pursuant to the Association's rules for commercial arbitration, but only after all internal resolution efforts have been exhausted. Minnesota law shall be the substantive law applied in any dispute. The venue for any dispute resolution shall be Minneapolis, Minnesota, in the case of lawyers and other exempt employees . . . The decision of the Arbitrator(s) shall be final and binding upon both parties.

---

**3.** The "Employment Agreement" Brown signed is the letter sent to plaintiff by Dorsey, dated September 20, 2002. This letter outlined the conditions of Brown's employment

with Dorsey, if she accepted the offer of employment. Both parties refer to the September 20th letter as Brown's "Employment Agreement."

Judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof. Regardless of whether a claim is arbitrated, any claim by either party for punitive damages is hereby waived.* * ... To the extent any clause or provision of this paragraph shall be determined to be invalid or unenforceable, or shall be determined to be invalid or unenforceable as applied to certain claims or issues, such determination shall not in any manner alter or affect either the validity and enforceability of the remainder of the paragraph or the validity and enforceability of the clause or provision in question as applied to any other claim or issue.

Oyaas Decl., Ex. 1 (Dorsey & Whitney Conflict Resolution Policy) at 1–2. This document was not given to Brown at the time she signed her employment agreement, although she was advised earlier that she could receive a copy upon her request. The Employment Agreement also provided:

We hope we have answered your questions about Dorsey & Whitney LLP. If you need answers to any outstanding questions or clarification of any of the terms and conditions set forth in this letter, please feel free to call me at [telephone number omitted]. We ask that you get back to us with your decision within two weeks since we are holding this position open for you. If you need some additional time, please let us

know as we would be happy to review your request.

We also hope you find our offer of employment acceptable and to your satisfaction.

Oyaas Decl. Ex. 2 (Employment Agreement). Brown signed and dated the Employment Agreement on September 26, 2000.

Defendant argues that the language of the Employment Agreement, which stated that plaintiff agreed to be bound to the firm's "dispute resolution policy," mandates that plaintiff's claims of racial discrimination be submitted to arbitration, in accordance with the agreement plaintiff signed. Def.'s Mem. at 2. In addition, in anticipation of plaintiff's arguments in opposition to its position, defendant states that it will waive the "two provisions that Brown may contend prejudice her rights or otherwise inconvenience her: the provision precluding recovery of punitive damages and the provision requiring arbitration to take place in Minneapolis, Minnesota." Id. at 5.[4]

In opposition, plaintiff argues that the defendant's employment agreement is unconscionable, and hence unenforceable. Memorandum of Points and Authorities in Support of Plaintiff Patricia Russell Brown's Opposition to Defendant's Motion to Dismiss and Compel Arbitration ("Pl.'s Opp'n") at 5. The agreement is unenforceable, plaintiff argues, because (1) plaintiff "was denied meaningful choice in deciding whether or not to sign the provision due to the fact that the [d]efendant intentionally

4. By letter dated January 27, 2003, counsel for Dorsey informed plaintiff's counsel that "Dorsey & Whitney does not intend to enforce the provision of the [d]ispute [r]esolution [p]olicy that precludes the recovery of punitive damages. In arbitration, Ms. Brown will be able to avail herself of all of the remedies available under Section 1981 and the D.C. Commission on Human Rights Act." Def.'s Mem., Ex. B (Letter to Jimmy A. Bell from Barbara L. Johnson dated January 27, 2003) at 1. In addition, in regards to the dispute resolution policy's requirement that disputes be arbitrated in Minneapolis, Minnesota, the letter provides that "the firm will give Ms. Brown the option of selecting Washington, D.C. as the venue for the arbitration if she does not wish to travel to Minneapolis." Id.

failed to disclose [to her the] binding arbitration provision[,]" *id.* at 6; (2) the terms of the agreement "unreasonably favor[ed] the [d]efendant[,]" *id.* at 8; and (3) the arbitration provision does not provide plaintiff with the full array of relief that she is entitled to under 42 U.S.C. § 1981 and the D.C. Human Rights Act, particularly in light of the waiver of punitive damages and the choice of law and forum selection clauses. *Id.* at 12, 18. For these reasons, plaintiff argues that the Court should conduct a summary trial, pursuant to 9 U.S.C. § 4 (2000), because the facts suggest that plaintiff was fraudulently induced into signing the agreement, defendant misrepresented or failed to represent the material terms of the agreement, defendant had the intent to deceive plaintiff to induce her to sign the agreement, and plaintiff relied upon a reasonable interpretation of the term "dispute resolution policy" as not encompassing binding arbitration and the waiver of her rights to a trial by jury and punitive damages. *Id.* at 16–26. Finally, plaintiff argues that arbitration should not be required in this case because it is not clear that the parties agreed to arbitrate and, in the absence of clear evidence supporting a finding that both parties so agreed, a trial should be had to determine whether there was an "unequivocal agreement to that effect." *Id.* at 28 (citing 9 U.S.C. § 4); *Smith Wilson Co. v. Trading & Dev. Establishment*, 744 F.Supp. 14, 17 (D.C.Cir.1990) (quoting *Par-Knit Mills v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir.1980)).

## II. Analysis

### A. Standard of Review

Defendant has filed a motion to dismiss "[p]ursuant to Federal Rule of Civil Procedure 12 ..." Def.'s Mem. at 1. Defendant does not state under which subsection of Rule 12 it seeks dismissal. Plaintiff does not address the applicable standard of review either, although she does cite cases in her opposition regarding the standard of review that applies when the Court considers a motion to dismiss for failure to state a claim. *See* Pl.'s Opp'n at 4. Both parties have attached documents to their pleadings, including declarations and affidavits, as well as the Employment Agreement at issue and the defendant's dispute resolution policy.

Technically, the defendant's motion does not "come[ ] within the ambit of Rule 12(b) of the Federal Rules of Civil Procedure, which allows a defendant to move to dismiss on, among other things, grounds that the court lacks subject matter jurisdiction or that the plaintiff's claim fails to state a claim upon which relief can be granted." *Raasch v. NCR Corp.*, No. CIV.A. 3–02–272, 2003 WL 1790748, at *1 (S.D.Ohio 2003). Pursuant to § 4 of the Federal Arbitration Act ("FAA" or "Act"), 9 U.S.C. § 1, *et seq.* (2000), the defendant is entitled to "petition ... [the] district court which, save for such agreement, would have jurisdiction ... for an order directing that such arbitration proceed in the manner provided for in such agreement." However, "the Act itself does not state that a document entitled 'motion to compel' must be filed to trigger the protections of the Act, but states that the party must 'petition' the court for an order directing arbitration to proceed. Courts, therefore, have allowed the party to 'petition' the court through the use of a motion to dismiss for lack of subject matter jurisdiction." *Thompson v. Nienaber*, 239 F.Supp.2d 478, 483 (D.N.J.2002). Because strict nomenclature regarding how a motion is titled is not required, "[t]he district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made between the parties, should give to the opposing party the benefit of all

reasonable doubts and inferences that may arise. . . . [I]nasmuch as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate[,]" consideration of the motion according to the "standard used by district courts in resolving summary judgment motions pursuant to Fed.R.Civ.P. 56(c) . . . is appropriate." *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.,* 636 F.2d 51, 54 & n. 9 (3d Cir.1980). Thus, "[a]lthough styled as a motion to dismiss, in a motion to stay proceedings and/or compel arbitration, the appropriate standard of review for the district court is the same standard used in resolving summary judgment motions pursuant to Fed.R.Civ.P. 56(c)." *Technetronics v. Leybold–Geaeus GmbH,* No. CIV.A. 93–1254, 1993 WL 197028, at *2 (E.D.Pa. 1993) (citations omitted); *see also Nelson v. Insignia/Esg, Inc.,* 215 F.Supp.2d 143, 147 (D.D.C.2002) (Walton, J.) (holding that "summary judgment [was] the proper procedural mechanism to use in evaluating whether the plaintiff must submit her claims to arbitration.").

Consistent with the above case authority, the Court concludes that the proper approach to employ in reviewing the defendant's motion to dismiss and compel arbitration is to apply the same standard of review that governs Rule 56 motions. Both parties have submitted to the Court with their pleadings documents that were not part of the complaint—namely, the parties' Employment Agreement, the defendant's dispute resolution policy, the plaintiff's affidavit, the declaration submitted by the defendant, and the plaintiff's resume—for the Court's consideration in addressing defendant's motion. Normally when a district court decides to convert a motion to dismiss under Rule 12 to one for summary judgment pursuant to Rule 56 because it has decided to consider matters

outside of the complaint and answer in addressing the motion, notice and the opportunity to supplement the record must be afforded. *See Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 361 (D.C.Cir. 1982) ("Under either Rule 12(b)(1) or Rule 12(b)(6), a court need not consider matters outside the pleadings at all. But once it decides to consult such matters it should so inform the parties and set a schedule for submitting additional affidavits and documents if the parties wish."). Neither is necessary here, however, for several reasons. First, the Court is not actually affecting a conversion for review under Rule 56, but is rather construing the motion for what it really is—a motion to compel arbitration pursuant to 9 U.S.C. § 4—and applying the Rule 56 standard of review in addressing the merits of the motion. A similar situation was faced by the court in *Thompson,* where the defendants filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) in lieu of a motion to compel arbitration pursuant to 9 U.S.C. § 4. 239 F.Supp.2d at 483. However, the *Thompson* court did not "dismiss the action because the wrong document was filed [since] the defendants would undoubtedly file a motion to compel arbitration and the parties would present the same arguments as presented here." *Id.* at 484. The court stated that it would therefore "avoid such a 'hypertechnical' ruling that would inevitably lead to duplicative litigation . . ." *Id.* Thus, the *Thompson* court considered whether the defendants were entitled to the relief they actually had requested despite how the motion had been titled, namely, whether the parties' dispute should be submitted to arbitration. The court did so in light of the fact that

all parties to the . . . dispute were fully aware that [the defendants'] motion dealt with the arbitrability of their dis-

pute and had the opportunity to respond appropriately. Defendants clearly argued that '[g]iven the broad arbitration clause in the Agreement ... there is no doubt that the arbitration clause governs this dispute and this Court lacks jurisdiction over this matter.' ... Counsel for plaintiffs responded that this Court should handle the matter 'regardless of whether an alternative dispute process has been initiated....

*Id.* at 483–84.

■ Similarly, in the case before this Court, plaintiff was fully aware that the defendant was seeking to have the Court compel arbitration and both parties have submitted documentary evidence along with their pleadings that were submitted in support of their respective positions. It is inconceivable that the parties did not submit everything relevant to the subject, and accordingly there is no reason to delay issuing a decision on the arbitration question to afford the parties further opportunity to supplement the record. *See Hollis v. United States Dep't of Army,* 856 F.2d 1541, 1544 (D.C.Cir.1988) (holding that district court did not err in converting defendant's motion to dismiss into one for summary judgment without providing notice to the parties and the opportunity to submit additional materials. "Since Rule 12(b)'s notice-and-opportunity requirement is designed to 'insure [ ] that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proof to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment,' ... no useful purpose can be served by its application where it is clear that the dispositive facts will remain undisputed and unchanged. By the same token, no prejudice can result from its nonobservance in any situation of that sort.") (internal footnotes omitted); *see also Snow v. BE .& K Construction*

*Co.,* 126 F.Supp.2d 5, 7 (D.Me.2001) (converting defendant's motion to dismiss or, alternatively, to compel arbitration, into one for summary judgment because "[i]t is within the [c]ourt's discretion to convert the 12(b)(6) motion to a summary judgment motion because [p]laintiff has had an opportunity to respond to the relevant factual allegations raised by [d]efendant.") (citing *Whiting v. Maiolini,* 921 F.2d 5, 6 (1st Cir.1990)). Therefore, because the parties will not be prejudiced by the Court's consideration of matters outside the pleadings, all which were submitted by the parties, the Court will treat defendant's motion as a request to compel the parties to arbitrate their dispute. And, in conducting this analysis, the Court will employ the standard of review applicable to the resolution of summary judgment motions.

■ Pursuant to Rule 56 of the Federal Rules of Civil Procedure "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... by affidavits or as otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court must grant the motion for summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing the defendant's motion to compel arbitration, the court must "give ... the [plaintiff] the benefit of all reasonable doubts and inferences that may arise." *Par–Knit Mills, Inc.,* 636 F.2d at 54; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). It is with this standard in play that the Court will evaluate the defendant's position that plaintiff must submit her claims to arbitration.

### B. Applicability of the FAA

■ As is apparent from the Court's prior discussion above, the Court concludes that this matter is governed by the FAA, 9 U.S.C. § 1 *et seq.* Section two of the FAA provides that the arbitration provisions in any "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court and the District of Columbia Circuit have both held that the provisions of the FAA are applicable to agreements to arbitrate contained in employment contracts. *See, e.g., Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 123, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) ("The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law ..."); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) ("It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA."); *Cole v. Burns Int'l Security Services,* 105 F.3d 1465, 1470–71 (D.C.Cir.1997) ("We hold that section 1 of the FAA does not exclude all contracts of employment that affect commerce.... A broad exclusion of all employment contracts could have simply said 'nothing herein shall apply to contracts of employment.' "). Therefore, as plaintiff's job was not in the category of employment positions excluded from the FAA's coverage,[5] the provisions of the FAA are applicable to the parties' dispute.[6]

■ The FAA has created a federal policy that favors the arbitration of employment disputes. *See Nelson,* 215 F.Supp.2d at 149 ("federal courts have recognized a strong public policy favoring arbitration ...") (citations omitted); *Nur v. K.F.C. USA, Inc.,* 142 F.Supp.2d 48, 50 (D.D.C.2001) ("Federal courts have recognized a strong policy favoring alternative means of dispute resolution ..."). As a result of this policy, any "ambiguities in the language of the [employment] agreement should be resolved in favor of arbitration." *EEOC v. Waffle House, Inc.,* 534 U.S. 279, 294, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002) (citing *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 476, 109 S.Ct.

---

**5.** 9 U.S.C. § 1 provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." As plaintiff was hired as an attorney in the defendant law firm, there is no reason to conclude that any of these exclusions apply to her.

**6.** As the District of Columbia Circuit Court noted in *Cole,* whether or not the FAA is applicable to plaintiff's dispute concerning the validity of the agreement she signed is really of no moment because

[t]he parties' agreement would still be a contract that waives [Brown's] right to a judicial forum for employment-related claims and agree[d] to submit those claims to arbitration. [Dorsey] would still have the right to seek enforcement of that contract. Although the applicability of the FAA may be significant in the sense that the statute prescribes certain procedural rules that might not otherwise obtain, we have little doubt that, even if an arbitration agreement is outside the FAA, the agreement may still be enforced and the arbitrator's award still may be subject to judicial review.

105 F.3d at 1472.

1248, 103 L.Ed.2d 488 (1989)). The FAA's presumption in favor of arbitration, however, is not boundless. Thus, the Act itself provides parties with the ability to challenge the enforceability of an agreement to arbitrate. *See* 9 U.S.C. § 4.[7] *See also Cole*, 105 F.3d at 1473 ("blind enforcement of arbitration agreements would undermine congressional intent as reflected in Title VII.").

Therefore, as the defendant notes, under the FAA, the Court has two questions it must answer before it can order plaintiff to submit her claims to arbitration, namely "under the FAA and applicable state law . . . (1)[did] the parties enter[ ] into a valid and enforceable arbitration agreement and, if they did, (2) does the arbitration agreement encompass the claims raised in the complaint?" *Nelson*, 215 F.Supp.2d at 149–50 (citing *Nur*, 142 F.Supp.2d at 50–51).[8]

### B. Did the Parties Enter Into an Enforceable Agreement to Arbitrate?

#### 1. Choice of Law

■■■ Before the Court can determine whether the parties entered into an enforceable agreement, it must first determine which jurisdiction's law it must apply in analyzing this issue. The defendant's Conflict Resolution Policy provides that "Minnesota law shall be the substantive law applied in any dispute." Oyaas' Decl.

Ex. 1 at 1. This designation does not end the Court's inquiry because there is no explicit choice of law provision in the Employment Agreement itself. However, this omission need not detain the Court long. Plaintiff relies on the law of the District of Columbia in support of her contract interpretation positions and defendant does not dispute the applicability of District of Columbia law in this regard. This apparent agreement is really of no moment because, to the extent the contract law of Minnesota does not differ significantly from the law of the District of Columbia, "[t]he absence of a true conflict compels the application of District of Columbia law by default." *Greaves v. State Farm Ins. Co.*, 984 F.Supp. 12, 15 (D.D.C.1997). In resolving choice of law issues, "[t]he trial court's obligation is to determine whether there is a 'false conflict' between the two putatively contradictory laws. . . . A false conflict exists when the laws of the different states are 1) the same; 2) different but would produce the same outcome under the facts of the case; or 3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws." *Id.* (citations omitted); *see also GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C.Cir.1992) (Under District of Columbia choice of law analysis, "the first step is to determine whether a 'true conflict' exists—that is, whether more than one jurisdiction has a potential interest in

7. Section 4 of the FAA provides, in part:
 A party aggrieved by the alleged . . . refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . The court shall hear the parties, and upon being satisfied that the making of the agreement . . . is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the

court shall proceed summarily to the trial thereof.

8. Because neither party has disputed that the broad language of the dispute resolution policy, which covers "any claims or disputes of any nature between an employee and the firm[,]" Oyaas Decl. Ex. 1, includes the claims that Brown seeks to assert in this litigation, the Court need not conduct further analysis of whether the agreement encompasses the claims raised in Brown's complaint.

having its law applied and, if so, whether the law of the competing jurisdictions is different.") (citations omitted). A review of Minnesota law reveals that regarding the subjects at issue here—unconscionability and fraudulent inducement—does not differ from District of Columbia law and therefore, the Court will apply District of Columbia law to its analysis of whether the Employment Agreement is enforceable.[9]

 ▮ However, even if the Court had to engage in a choice-of-law analysis, application of District of Columbia law choice-of-law principles would still cause the Court to conclude that it must apply District of Columbia law. *Ideal Electronic Security Co. v. International Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C.Cir.1997); *Shenandoah Associates Ltd. Partnership v. Tirana*, 182 F.Supp.2d 14, 18 (D.D.C.2001) (citations omitted). In cases involving contract disputes, the courts in this circuit apply the "significant relationship test," which is derived from the Restatement (Second) of Conflict of Laws § 188 (1971). *Ideal Electronic Security Co.*, 129 F.3d at 148; *Century Int'l Arms, Ltd. v. Federal State Unitary Enterprise State Corp. 'Rosvoorouzheinie'*, 172 F.Supp.2d 79, 89 (D.D.C.2001); *Estrada v. Potomac Electric Co.*, 488 A.2d 1359, 1361 (D.C.1985). Pursuant to section 188, in the absence of an "effective choice of law by the parties ... the contacts to be taken into account" include:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of

the subject matter of the contract, and (e) the domicil[e], residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of Laws § 188. These factors, with the exception of the defendant's residence,[10] all favor the application of District of Columbia law to disputes related to the parties' Employment Agreement. The Agreement was presumably negotiated in the District of Columbia as there is no evidence to suggest that Brown traveled to Minnesota to negotiate it. The offer of employment was made for a position as "an Associate in the Technology Group in [Dorsey's] Washington, D.C. office ..." Oyaas Decl. Ex. 2 at 1. Finally, the factor regarding the domiciles of the parties neither supports nor weighs against the application of District of Columbia law as plaintiff resides in Maryland and although defendant's principal office is in Minnesota, the absence of any allegation that events of significance pertaining to the formation of the contract occurred there renders the domicile factor of minimal importance to the choice of law analysis. *See, e.g., Keene Corp. v. Insurance Co. of North America*, 597 F.Supp. 934, 941 (D.D.C.1984) (holding that the law of defendant's principal place of incorporation, Massachusetts, would apply to plaintiff's claim for punitive damages in an action for breach of an insurance contract where, "[r]egardless of the place of actual decision, Massachusetts has the greatest connection to the conduct as the 'place

---

9. Reference will be made to Minnesota law in the Court's discussion of plaintiff's contract claims for comparative purposes.

10. In her opposition to defendant's motion to dismiss, plaintiff states that defendant's "principal offices are located in Minneapolis, Minnesota ... [,]" Pl.'s Opp'n at 15, while in her complaint plaintiff only states that "Defendant operates a licensed business in the

District of Columbia." Compl. ¶ 3. However, on this point, the Employment Agreement itself lists Dorsey's address as 220 South Sixth Street, Minneapolis, Minnesota, 55402–1498, not its District of Columbia address, which supports a finding that the firm's principal offices are located in Minnesota, not the District of Columbia.

where ultimate responsibility for the conduct lies.'") (citation omitted); *Nelson*, 215 F.Supp.2d at 150 (holding that "District of Columbia law [would] control[ ] [the Court's analysis of] ... whether the arbitration agreement [was] a valid contract ... because both the formation and the performance of the contract occurred in this jurisdiction."). Therefore, District of Columbia law controls whether the parties entered into an enforceable agreement to arbitrate their disputes.

### 2. Is the Employment Agreement Enforceable under District of Columbia law?

Interestingly, plaintiff does not merely argue that the dispute resolution policy contained in the Employment Agreement she signed is unenforceable but she argues that the Employment Agreement as a whole is invalid and unenforceable. Parsing through the myriad of legal arguments advanced by the plaintiff, there are essentially two main positions she advances in support of her claim that the employment contract is invalid and hence unenforceable: (1) the agreement is unconscionable and (2) plaintiff was fraudulently induced into signing the agreement. The Court will reject both positions.

### (a) Unconscionability

Plaintiff makes several arguments regarding why the Employment Agreement as a whole is unconscionable. First, she argues that she "was denied meaningful choice in deciding whether or not to sign the [dispute resolution] provision due to the fact that the [d]efendant intentionally failed to disclose [to her the] binding arbitration provision." Pl.'s Opp'n at 6. Second, she contends that the agreement is unconscionable because "the [d]efendant intentionally withheld material terms of the ... [a]greement ... and ... these undisclosed material terms served to un-

reasonably favor the defendant." *Id.* at 8. Third, plaintiff alleges that the Employment Agreement is unconscionable because it deprives plaintiff of the statutory relief she would otherwise be entitled to and, despite defendant's offer to forego enforcement of these provisions, defendant "cannot unilaterally enforce certain provisions of its Employment Agreement while choosing not to enforce others ..." *Id.* at 12.

Plaintiff relies on the case of *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445 (D.C.1965) ("*Walker–Thomas II*") in arguing that the Court should determine that the Employment Agreement is unconscionable. At issue in *Walker–Thomas II* was whether a furniture company's consumer contracts, which contained an "obscure provision" that provided that any new items purchased by a customer were to be "secured by the right [of the defendant] to repossess all the items previously purchased by the same purchaser, and each new item purchased automatically became subject to a security interest arising out of the previous dealings[ ]" were enforceable. *Id.* at 447. Although the *Walker–Thomas II* court did not determine whether this provision made the contract unconscionable, due to the trial and local appellate courts' failure to make findings of fact on the issue, *id.* at 450; *see, i.e., Williams v. Walker–Thomas Furniture Co.*, 198 A.2d 914, 916 (D.C.1964) ("*Walker–Thomas I*"), the court noted that "[u]nconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." 350 F.2d at 449; *see also Dorso Trailer Sales, Inc. v. American Body & Trailer, Inc.*, 372 N.W.2d 412, (Minn.Ct. App.1985) ("A finding of unconscionability requires that one contracting party show

that it had no 'meaningful choice' but to accept the contract term as offered, and that the . . . clause [at issue] was 'unreasonably favorable' to the other party.") (citing *RJM Sales & Marketing v. Banfi Products Corp.*, 546 F.Supp. 1368, 1375 (D.Minn.1982)); *Patterson v. Walker–Thomas Furniture*, 277 A.2d 111, 113 (D.C.1971).

■ Determining whether a party had a meaningful choice in the execution of a given contract "can only be determined by consideration of all the circumstances surrounding the transaction." *Walker–Thomas II*, 350 F.2d at 449. Factors a court can consider in making this determination include: (1) whether the "meaningfulness of the choice is negated by a gross inequality of bargaining power[,]"; and (2) the circumstances surrounding the contract's formation, *i.e.*, "[d]id each party to the contract, considering his [or her] obvious education or lack of it, have a reasonable opportunity to understand the terms of the contract, or were the important terms hidden in a maze of fine print and minimized by deceptive sales practices?" *Id.* On this point, the court further stated that although "[o]rdinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain . . . when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms." *Id.*

■ Plaintiff argues that she had little bargaining power because "the [a]greement was offered on a take-it-or-leave-it basis[ ] . . . [and she] was not able to bargain for specific terms or provisions, and employment was conditioned on the signing of the Agreement." Pl.'s Opp'n at

7. The Employment Agreement itself belies plaintiff's claims. For example, paragraph five of the Agreement provides:

5. *As agreed upon,* your reduced time percentage election is 80%. Thus, your annual billable and guideline hours requirement will be reduced accordingly.

Oyaas' Decl. Ex. 2 (Employment Agreement) at 2 (emphasis added). Furthermore, the agreement provided:

*We hope we have answered your questions about Dorsey & Whitney LLP. If you need answers to any outstanding questions or clarification of any of the terms and conditions set forth in this letter, please feel free to call me at [telephone number omitted]. We ask that you get back to us with your decision within two weeks since we are holding this position open for you. If you need some additional time, please let us know as we would be happy to review your request.*

*We also hope you find our offer of employment acceptable and to your satisfaction.*

*Id.* at 3 (emphasis added).

These two provisions of plaintiff's Employment Agreement do not correspond with her position that she was the victim of unequal bargaining power. First, plaintiff was able to bargain for a reduced annual billable hours requirement. In addition, Dorsey's statement that plaintiff was free to ask for "clarification" of any of the terms of the agreement, and that she had two weeks to consider whether to accept the position is further support that she was not pressured to accept the agreement on defendant's terms. Moreover, plaintiff, a Harvard educated attorney with a Princeton undergraduate degree and at least seven years of prior legal experience when she signed the agreement, including experience with two other large law firms,

clearly was not an unknowledgeable or uneducated person dealing with an employer with superior bargaining power. She clearly negotiated for conditions of employment that she found beneficial. In sum, the record does not support a finding that plaintiff was the victim of unequal bargaining power and therefore did not have a meaningful choice when she signed the agreement. *Cf. Walker–Thomas II,* 350 F.2d at 448 (court noted that "[s]ignificantly, at the the time of this and the preceding purchases, [the defendant] was aware of [the plaintiff's] financial position.... Nevertheless, with full knowledge that [plaintiff] had to feed, clothe and support both herself and seven children on this amount, [defendant] sold her a $514 stereo set."); *Hooters of America, Inc. v. Phillips,* 39 F.Supp.2d 582, 615 (D.S.C. 1998) (noting that there was a "marked disparity in the parties' bargaining power" where the employee of a "large restaurant chain ... had been led to believe by certain mid-level managers that she would not have been put on the list for working until she executed the arbitration agreement. This meant [the plaintiff] would, for all practical purposes, have been unemployed unless she acceded to the agreement's terms, giving her no bargaining power."). The fact that plaintiff did not consider Dorsey's dispute resolution policy important enough to review before she signed the agreement does not negate the fact that she was not the victim of unequal bargaining power.

Despite the language in the agreement, plaintiff argues that "[g]iven the totality of the circumstances under which [she] was encouraged to sign the Employment Agreement, [p]laintiff was disadvantaged by the absence of meaningful choice." Pl's Opp'n at 6. However, plaintiff does not set forth any specific facts that support this claim. At the time Dorsey extended an offer of employment to plaintiff, she was employed and voluntarily chose to leave her employment for what plaintiff presumably believed was a better opportunity for her. This is therefore not a case where the plaintiff was compelled to sign the Employment Agreement because she feared being unemployed if she failed to do so. *Cf. Trumbull v. Century Marketing Corp.,* 12 F.Supp.2d 683, 686 (N.D.Ohio 1998) (court noted its "reservations about finding a waiver of legal rights in the employer-employee context ... because employment contracts rarely result from bargaining between the parties. Rather, an employee is given a contract to sign on a take-it-or-leave-it basis. If she leaves it, she loses the opportunity for employment."). Thus, there is nothing in the record here that suggests that plaintiff was in need of a job and thus had to sign the Employment Agreement on the terms presented to her.

The second factor the Court can consider in assessing whether plaintiff had a meaningful choice when she decided to sign the agreement is whether she had "a reasonable opportunity to understand the terms of the contract ..." *Walker–Thomas II,* 350 F.2d at 449. This is not a case where "important terms [were] hidden in a maze of fine print and minimized by deceptive ... practices[.]" *Id.* The Court can agree with plaintiff that the term "dispute resolution policy" did not explicitly inform plaintiff that she would be subject to binding arbitration regarding any disputes arising from her employment with Dorsey; however, it cannot agree that the term was so deceptive that it rendered the agreement as a whole unconscionable. The simple reality is that plaintiff was given the "opportunity to understand the terms of the contact ..." *Id.* However, rather than exercising the opportunity to review the policy, plaintiff chose to speculate about what the dispute resolution policy entailed.

Surely this error in judgment cannot be blamed on anything Dorsey did. *See Nur,* 142 F.Supp.2d at 51 (rejecting plaintiff's claims that "he did not know 'the implications of his opting for arbitration' and that [his employer] did nothing to encourage him to 'think the matter through before signing.' ... Nur's arguments are without merit. First, under basic contract law, '[o]ne who signs a contract which he had an *opportunity* to read and understand is bound by its provisions.' ... *That Nur may not have comprehended the implications of his decision is irrelevant as to whether the agreement is valid.*") (emphasis in original and emphasis added) (citation omitted).

As to this second component of assessing unconscionability, plaintiff also argues that the "undisclosed material terms [of the Employment Agreement] served to unreasonably favor the [d]efendant." Pl.'s Opp'n at 8; *see Walker–Thomas II,* 350 F.2d at 449. Plaintiff argues that the defendant's dispute resolution policy was unreasonably favorable to the defendant because it would require plaintiff, a resident of Maryland, to "travel innumerable miles to Minnesota, a state that the [p]laintiff has never worked in, lived in, or even visited[,]" whereas Minnesota is the location of the defendant's principal place of business and therefore defendant would not be inconvenienced by having to arbitrate in that forum. Pl.'s Opp'n at 9, 15. Further, plaintiff notes that the terms of the dispute resolution policy would subject plaintiff "to the laws of Minnesota, applying the rules of the American Arbitration Association[,]" but plaintiff does not explain why these consequences taken alone would be more favorable to Dorsey. *Id.* at 9. Finally, plaintiff argues that the terms of the Employment Agreement are unreasonably favorable to defendant because the dispute resolution policy requires plaintiff to forego rights that she would otherwise

be entitled to, *i.e.,* recovery of punitive damages. *Id.* at 9–10. And, even though defendant has now offered to waive the prohibition on the recovery of punitive damages and has agreed to arbitrate the dispute in the District of Columbia, plaintiff argues that these concessions are of no moment because defendant "cannot under general contract law, unilaterally enforce certain provisions of its Employment Agreement while choosing not to enforce others ..." *Id.* at 10.

The Court cannot agree with the plaintiff's position that the terms of Dorsey's dispute resolution policy are so unreasonably favorable to the defendant that the Court must find the Employment Agreement as a whole unconscionable. Aside from the waiver of punitive damages, and perhaps the forum selection clause, as will be discussed below, the terms of the policy are not so favorable to the defendant that they render the agreement unconscionable. This conclusion is illustrated when a comparison is made between the arbitration agreement at issue here and the one in *Hooters,* 39 F.Supp.2d at 615, where the court held that the employer's arbitration agreement was unconscionable. *Id.* at 613. The clause in *Hooters* provided, in part:

In consideration of the Company offering you employment and employing you, you and the company each agrees [sic] that, provided, when appropriate, the employee, complies with the company's open door policy and/or compliance resolution procedure, the employee and the company agree to resolve any claims pursuant to the company's rules and procedures for alternative resolution of employment-related disputes, as promulgated by [the] company from time to time (the "Rules"). Company will make available or provide a copy of the rules upon written request of the employee.

*Id.* at 594. Thus, similar to the agreement here, the employer in *Hooters* made reference in the employment agreement to its "compliance resolution procedure" and "alternative resolution" procedures that were further explained in the "Rules," which an employee had to make a written request to obtain. However, unlike the arbitration provision here, the "Rules" were only beneficial to the employer and led the court to "the inevitable conclusion that the multiple one-sided provisions in the Hooters Rules [were] unconscionable." *Id.* at 614. Specifically, the *Hooters* court noted that the "Rules"

> stripped [the plaintiff] of her right to a judicial forum for a Title VII violation and, more important, she has been stripped of numerous substantive remedies under Title VII. For example, her rights to compensatory damages, backpay relief, frontpay relief, punitive damages and attorney's fees are either eliminated or substantially curtailed under the Hooters damages provisions.... Even the burden of proof on [the plaintiff] in the arbitral scheme is higher than it would be if she had a judicial forum because the arbitrator is to consider 'the company's policies or procedures ... and management directives' in determining whether a violation of Title VII occurred.... Moreover, she has also been injured by the imposition of numerous unfair procedural rules that she would not be faced with in court. For example, just to name a few provisions, she has acceded to Hooters acting as the sole gatekeeper to the list of "Approved Arbitrators" ...; she has acceded to severe discovery limitations ...; she has acceded to one-way witness disclosure ... and one-way witness sequestration ...; she has acceded to empowering Hooters with total control over the official record ...; and she has acceded to impaired, or sharply curtailed, judicial

review under 9 U.S.C. § 10. These are, indeed, severe injuries [the plaintiff] suffers if the Hooters agreement is enforced.

*Id.* at 614–615.

The Court finds the *Hooters* circumstances significantly distinguishable from the situation in the instant case, and these differences support the Court's conclusion that the agreement at issue here is not unconscionable. First, as discussed below, Dorsey has agreed to waive two of the provisions that plaintiff contends are unreasonably favorable to Dorsey. And, aside from these provisions, plaintiff points to nothing in the dispute resolution policy that would unreasonably favor the defendant. As indicated previously, plaintiff's argument that she is somehow prejudiced by the application of Minnesota law and the application of the rules of the American Arbitration Association ("AAA"), Pl.'s Opp'n at 9, has not been demonstrated, and courts have firmly rejected blanket presumptions by plaintiffs that arbitration is *per se* disadvantageous. *See Circuit City Stores, Inc.*, 532 U.S. at 123, 121 S.Ct. 1302 ("We have been clear in rejecting the supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context.... Arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which involves smaller sums of money than disputes concerning commercial contracts.") (citations omitted); *Cole*, 105 F.3d at 1487 (holding that because "meaningful judicial review ... [of the arbitrator's award], is available, [the plaintiff-employee's] agreement to arbitrate [was] not unconscionable or otherwise unenforceable."). Therefore, compelling plaintiff to arbitrate her dispute will "not [cause her to] forgo the substantive rights afforded by the stat-

ute[s] [to employment disputes of the nature involved in this case]; it only submits ... their resolution in an arbitral, rather than a judicial, forum." *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)).

Regarding the defendant's waiver of the presumably prohibitive provisions of the arbitration agreement, case law conflicts with plaintiff's argument that the agreement as a whole is unenforceable, and so it must be rejected. It is true that the basis for courts' enforcement of agreements to arbitrate employment disputes is that the employee " '[b]y agreeing to arbitrate a statutory claim ... does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum.' " *Gilmer,* 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. 3346). However, in cases where defendants have agreed to waive enforcement of potentially unenforceable provisions of employment contracts, courts have held that the waiver of such provisions is sufficient to guarantee the enforcement of the employee's statutory rights. For example, in *Nelson,* this Court was confronted with an arbitration agreement that contained a fee splitting provision, which presumably, in light of *Cole,* would have rendered the agreement to arbitrate invalid. 215 F.Supp.2d at 157. However, this Court "conclud[ed] that [the] defendant's offer to pay all fees and expenses of arbitration effectively obviated any concerns the plaintiff may have raised regarding her ability to vindicate her claims in an arbitral forum because of the fee-splitting provision in the arbitration agreement." *Id.* (citations omitted). *See also Large v. Conseco Fin. Servicing Corp.,* 292 F.3d 49, 56–57 (1st Cir.2002) (holding that plaintiffs' challenge to the enforceability of the arbitration agreement they signed on the basis that they might have to pay the costs of arbitration was not viable because the defendant's "offer to pay the costs of arbitration and to hold the arbitration in the [plaintiffs'] home state of Rhode Island mooted the issue of arbitration costs."); *Nur,* 142 F.Supp.2d at 52 (rejecting plaintiff's claims "that the arbitration agreements [were] invalid because they [did] not indicate who shall pay the costs of arbitration. This issue [was] moot given that [defendant] state[d] in its most recent pleading that 'it [would] pay for the costs of arbitration.' "). Consistent with what the courts in *Large* and *Nur* held, and this Court's ruling in *Nelson,* the Court concludes that the concessions offered by the defendant moots plaintiff's claim that the dispute resolution policy unreasonably favors defendant.[11] Furthermore, as argued by defendant, the Dispute Resolution Policy contains a severability clause that provides "[t]o the extent any clause or provision of this paragraph shall be determined to be invalid or unenforceable ... such determination shall not in any manner alter or affect either the validity and enforceability of the remainder of the paragraph ..." Oyaas Decl. Ex. 1. Plaintiff has not advanced any argument regarding why this clause should not be enforceable if the Court deems portions of the Dispute Resolution Policy invalid.

---

**11.** In conjunction with rejecting plaintiff's unconscionability claim, the Court will order defendant to file a stipulation reaffirming its willingness to waive the prohibition against the recovery of punitive damages and its agreement to permit plaintiff to pursue her remedies available pursuant to the District of Columbia Human Rights Act and to arbitrate this matter in Washington, D.C., thus ensuring that plaintiff will not lose any of the statutory rights otherwise guaranteed to her.

For all of these reasons, the Court concludes that the Employment Agreement is not unconscionable.

### (b) Fraudulent Inducement and Fraud

Next, plaintiff argues that she was fraudulently induced into signing the Employment Agreement because defendant "fraudulently and falsely misrepresented its policy to [her]." Pl.'s Opp'n at 18. Further, plaintiff argues that the fact that defendant provided other documents to her, such as the benefits package information and "papers related to its ethics and loss prevention policies" demonstrates that the defendant "intentionally withheld the binding arbitration provision of its [d]ispute [r]esolution [p]olicy from the [p]laintiff in an attempt to deceive her into signing the agreement." *Id.* at 24. Plaintiff contends that such "nondisclosure ... may constitute fraud." *Id.* at 24 (citations omitted).[12] Finally, plaintiff argues that she "reasonably relied on the common meaning of the term 'dispute resolution policy' and signed the Employment Agreement with the [d]efendant ..." *id.* at 27, presumably based on her understanding of the term.

■ To avoid enforcement of a contract based on a claim of fraudulent inducement in the making of a contract, a plaintiff must demonstrate:

(1) misrepresentation or omission about [an] essential term of [the] contract was made [to her] ...; (2)[the] misrepresentation or omission was [a] material factor in inducing [the] claimant to sign [the] contract; and (3)[the] claimant signed [the] contract believing the representation or omission was true.

*Haynes v. Kuder,* 591 A.2d 1286, 1290 n. 5 (D.C.1991); *see also Carpenter v. Vreeman,* 409 N.W.2d 258, 261 (Minn.Ct.App. 1987) ("A misrepresentation is fraudulent if it is intended to induce a contract and either is known to be false or is made without knowledge of whether it is true or false.") (citation omitted). Here, the Court cannot conclude that plaintiff was fraudulently induced into signing the Employment Agreement. Defendant in no way misrepresented the terms of the "dispute resolution policy" that was part of the Employment Agreement, and although plaintiff was not actually provided with the policy, she was offered the opportunity to obtain a copy of it. Although plaintiff states that she signed the agreement with the belief that the dispute resolution policy language in the Employment Agreement "was simply informing [her] that [she] would have to first attempt to resolve any workplace conflicts internally ... [,]" Pl.'s Opp'n, Ex. B (Affidavit of Patricia Russell Brown) ("Brown Aff."), she makes no allegation and presents no evidence that would support a finding that a Dorsey

---

**12.** Plaintiff argues that "[a] district court hearing a claim of fraud in the inducement of a contract shall proceed summarily to trial on that point." Pl.'s Opp'n at 16 (citing 9 U.S.C. § 4). "Proceeding 'summarily' means that the court initially determines whether material issues of fact are disputed and, if such factual disputes exist, then conducts an 'expedited evidentiary hearing' to resolve the dispute." *Haynes v. Kuder,* 591 A.2d 1286, 1290 (D.C.1991) (citations omitted). Plaintiff is partially correct regarding her assertion that *John Thompson Beacon Windows, Ltd. v. Fer-*

*ro,* 232 F.2d 366, 367 (D.C.Cir.1956) holds "that a jury trial be held pursuant to 9 U.S.C. § 4[,]" Pl.'s Opp'n at 16, but "a trial is warranted [only] if the court is not satisfied that the making of an arbitration agreement is not in issue, as it then must " 'summarily' ... try the issues upon which the petitioner's right to arbitration depends." *John Thompson,* 232 F.2d at 367. Because the Court here is satisfied that the plaintiff entered into a valid agreement to arbitrate, there is no need for a trial on that issue.

representative led her to believe this was the case. As the *Hooters* court stated, the plaintiff employee did not have a claim of fraudulent inducement as a defense to signing her employer's binding arbitration agreement because, even assuming a representative of the defendant

> made false representations, [the plaintiff] had no right to rely on them when the truth of [the employer's agent's] representations concerning the fairness of the [arbitration] procedure or the impartiality of the arbitrators ... would have been evident by an inspection of the Rules. One cannot complain of fraud in the misrepresentation of the contents of written instruments signed by him when the truth could have been ascertained by reading the instrument, since one entering into the written contract should read it and avail himself of every opportunity to understand its content and meaning.... The arbitration agreement as well as the handbook provisions read aloud governing the ADR program expressly referenced the Rules and informed [the plaintiff] of how she could obtain a copy of them from a Divisional Vice President. Accordingly ... the court finds no persuasive evidence establishing fraudulent inducement of the arbitration agreements executed by [the plaintiff].

39 F.Supp.2d at 607 (citation omitted). The same conclusion is called for in this case.

 Plaintiff's allegations of fraud are similarly unavailing here. To establish a claim of common law fraud, a plaintiff must show that there was "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken on reliance upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C.1977); *see also Flynn v. Amer-*

*ican Home Products Corp.*, 627 N.W.2d 342, 349 (Minn.Ct.App.2001) ("Under Minnesota law, fraudulent misrepresentation based on the concealment of a material fact occurs when one party knowingly conceals a material fact that is 'peculiarly within his own knowledge' and the other party relies on the presumption that the fact does not exist.") (citation omitted). Plaintiff cites *Bennett* and *Pyne v. Jamaica Nutrition Holdings, Ltd.*, 497 A.2d 118, 131 (D.C.1985) for the proposition that "nondisclosures, silence or active misrepresentation may constitute fraud." Pl.'s Opp'n at 25. However, *Pyne* and *Bennett* merely support the proposition that "[n]ondisclosure of material information may constitute fraud ... especially where there is a duty to disclose." *Pyne*, 497 A.2d at 131; *see also Bennett*, 377 A.2d at 59 ("Nondisclosure or silence, as well as active misrepresentation, may constitute fraud.").

Plaintiff provides no authority to support the proposition that Dorsey had an affirmative obligation to ensure that she read the dispute resolution policy that was referenced in the Employment Agreement or that she ever stated during the negotiations what she thought the term "dispute resolution policy" entailed and someone from Dorsey affirmed her misunderstanding or failed to dispel that belief. *See Flynn*, 627 N.W.2d at 350 ("[C]entral to ... a claim [of fraudulent misrepresentation] is that 'there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him.' ... The general rule is that 'one party to a transaction has no duty to disclose material facts to the other' except 'when the parties are in a fiduciary relationship with each other.' ") (citations omitted); *Hooters*, 39 F.Supp.2d at 607 ("[Plaintiff] contend[ed] Hooters' failure to provide a copy of the

Rules or emphasize their importance [at the time they were announced] constituted fraudulent concealment. The court rejects this claim. An employer/employee relationship is not a fiduciary relationship upon which a fraudulent concealment action could spring. 'A fiduciary relationship cannot be established by the unilateral action of one party.' ... [Plaintiff] produced no evidence that Hooters intended to create a fiduciary or confidential relationship with her, and therefore Hooters had no duty under South Carolina tort law to disclose all significant terms.... Thus, [plaintiff's] fraud claim is without foundation."); *accord Nur*, 142 F.Supp.2d at 51 (Rejecting plaintiff employee's argument that his claims need not be submitted to arbitration because he did not understand the " 'implications of his opting for arbitration' and that [defendant] did nothing to encourage him to 'think the matter through before signing.... [Plaintiff] cites no case law, and the court is aware of none, that requires employers to 'go out of [their] way ... to recommend to the employee that he or she think the matter through before signing' an arbitration agreement.... Indeed, it [was the plaintiff's] responsibility to 'think the matter through' before he signs any contract. [The plaintiff] has presented no support for the notion that employers somehow have an affirmative duty to make sure their employees 'think' before signing employment agreements."). On the facts before the Court in this case, the Court cannot find that there was fraudulent concealment of material terms of the Employment Agreement.

### (3) Did the Parties Agree to Arbitrate?

■ For the Court to require arbitration under the FAA, it must be able to conclude that the parties to the contract explicitly agreed to arbitrate the dispute at issue. *Nur*, 142 F.Supp.2d at 50–51. Under District of Columbia law, " '[a]rbitration is predicated upon the consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate a matter is to be determined by the courts on the basis of the contracts between the parties.' " *Bailey v. Fed. Nat'l Mortgage Assoc.*, 209 F.3d 740, 746 (D.C.Cir.2000) (citing *Ballard & Assocs., Inc. v. Mangum*, 368 A.2d 548, 551 (D.C. 1977)). In *Bailey*, the Circuit Court held that an employee did not clearly have an intention to submit his dispute to arbitration, as the defendant's arbitration policy was issued after the plaintiff was already employed by the defendant and the plaintiff had filed a written complaint prior to the date the policy went into effect. *Id.* at 742. Moreover, the plaintiff in *Bailey* "never said or wrote anything ... either to rescind what he had said in his written complaint or to otherwise indicate that he subscribed to the Dispute Resolution Policy." *Id.* at 745. In fact, the *Bailey* court noted, the plaintiff's attorney "wrote to officials at [his place of employment] to make it clear that Mr. Bailey was not bound to pursue his claims in arbitration." *Id.* The court held that these facts, in addition to the fact that plaintiff had "never executed any written agreement with Fannie Mae to arbitrate statutory claims of employment discrimination[,]" *id.*, required it to find that "[t]here was no 'meeting of the minds' [as required under District of Columbia law] ... because Mr. Bailey did nothing whatsoever to embrace the employer's [dispute resolution] proposal." *Id.* at 746.

■ In contrast to the circumstances in *Bailey*, here plaintiff was presented with an employment agreement which called for her to agree to be bound by the law firm's dispute resolution policy. Not knowing what the exact policy was, and

without requesting a copy of the policy even though she was told she could have access to it, plaintiff signed the Employment Agreement. "[A] signature on a contract indicates 'mutuality of assent' and a party is bound by the contract unless he or she can show special circumstances relieving him or her of such an obligation." *Emeronye v. CACI Int'l, Inc.,* 141 F.Supp.2d 82, 86 (D.D.C.2001) (citing *Davis v. Winfield,* 664 A.2d 836, 838 (D.C. 1995) (other citations omitted)). In *Emeronye,* on which the defendant relies, the court rejected the plaintiff's arguments that her employer's arbitration clause was not enforceable because the "[ (1) ] Employ[ment] agreement was a contract of adhesion to which she did not assent and [ (2) ] she [could not] waive her statutory rights in the absence of a clear and explicit waiver, which the Agreement did not contain." *Id.* at 85. The plaintiff in *Emeronye* was "a Nigerian female with a law degree from the University of London and an L.L.M. degree from DePaul University, majoring in health law[,]" who was offered a position with the defendant as a paralegal. *Id.* at 84. In seeking to invalidate an agreement to arbitrate, the plaintiff argued that there was no "meeting of the minds [because] she was presented with a number of forms to sign [and did] not recall signing the Employment Agreement or having discussions with anyone [associated with the defendant] about the agreement, [did] not recall agreeing to arbitration, and d[id] not recall reading the arbitration policy or having a copy given to her." *Id.* at 85. The *Emeronye* court held that "[n]one of these claims render[ed] the arbitration clause unenforceable." *Id.* Specifically, the court stated that

> [p]laintiff has failed to show any special circumstances that would negate her assent to the contract. The offer of employment letter signed by plaintiff states

that the Employee Agreement is attached and that '[y]our signature on these documents acknowledges your understanding of the requirements contained therein, and your agreement to abide by them.' ... The 'Employment Agreement' was only two pages long. The fact that plaintiff does not recall signing the agreement, that she had other paperwork to complete, or that the arbitration provision was not explained to her is insufficient to render the contract unenforceable.

*Id.* at 86 (citations omitted). In addition, in *Emeronye* the court rejected the plaintiff's argument "that the arbitration clause [was] unenforceable because it [did] not contain a clear waiver of statutory rights ..." *Id.* at 87. The court found that this argument was not persuasive because the "plaintiff [was] not waiving any substantive rights but simply subjecting her claims to a different forum.... [P]laintiff's waiver of the judicial forum is valid under applicable contract law and is not subject to any additional requirements." *Id.*

This Court finds the facts of *Emeronye,* although distinguishable, analogous to the present situation. Similar to the plaintiff in *Emeronye,* who argued that she did not "recall" reading or signing the arbitration agreement, the plaintiff here did not read the dispute resolution policy, when she had the *opportunity* to do so. This does not constitute "special circumstances" that warrants absolving the plaintiff from having to comply with the terms of the agreement. *Id.* at 86; *see also Nur,* 142 F.Supp.2d at 51 (rejecting plaintiff's claims that agreement to arbitrate was invalid because "he did not know 'the implications of his opting for arbitration' and that [his employer] did nothing to encourage him to 'think the matter through before signing.' ... First, under basic contract law, '[o]ne who signs a contract which he had an

*opportunity* to read and understand is bound by its provisions.' ... *That [the plaintiff] may not have comprehended the implications of his decision is irrelevant as to whether the agreement is valid.")* (emphasis in original and emphasis added) (citation omitted); *cf. Hooters,* 39 F.Supp.2d at 615 (holding that employee would not be held to the terms of Hooter's arbitration rules where "there was an extreme element of surprise to the harshness of the Rules, which were not on site at the time [they were announced]. Moreover, although notionally [the plaintiff] could have asked in writing for a copy of the Rules, the court will not ignore the fact that the [announcement of the Rules] occurred right before Thanksgiving, that [the plaintiff] was told she had five days to consider the matter, and that nothing in the agreement emphasized that the 'guts' of the Hooters arbitral scheme was buried in the Rules."). As the *Nur* court's decision makes clear, where an employee has been provided with the *opportunity* to read an agreement whose terms concerning a duty to arbitrate are understandable, and there are no facts that suggest that material terms "were intentionally withheld from" the employee, the agreement should not be invalidated in the absence of "duress, fraud or coercion[,]" 142 F.Supp.2d at 51, none of which this Court finds to be present in the instant case.

Plaintiff also argues that the defendant's vague reference to its "dispute resolution policy" was insufficient to put her on notice of the binding arbitration provision contained in the policy. Pl.'s Opp'n at 32–35. However, it is clear that the policy was available for her to review and there was no duty on the part of the employer to ensure that plaintiff understood what the term "dispute resolution policy" entailed in the absence of her raising a question about what that phrase meant. Plaintiff has not submitted any authority to suggest that

"employers somehow have an affirmative duty to make sure their employees 'think' before signing employment agreements.... In the absence of some special circumstances such as duress, fraud, or coercion ... the court finds that the arbitration agreement[ ] [plaintiff] signed [is] valid and enforceable." *Nur,* 142 F.Supp.2d at 51; *see also Emeronye,* 141 F.Supp.2d at 87 (rejecting employee's argument that "the arbitration clause is unenforceable because it d[id] not contain a clear waiver of statutory rights ..." where plaintiff would not be "waiving any substantive rights but simply subjecting her claims to a different forum.").

Finally, plaintiff's position as an experienced attorney further supports the conclusion that she should be bound by the terms of the dispute resolution policy. The Court does not disagree with plaintiff's argument that the *Emeronye* court did not hold that "persons with legal training should be bound by a contract when the provisions have not been clearly and concisely disclosed to him or her." Pl.'s Opp'n at 43. However, it is clear that courts dealing with similar situations have taken the education and background of the employee into account in determining whether the employee should be bound by an arbitration agreement. *See, e.g., Gilmer,* 500 U.S. at 33, 111 S.Ct. 1647 (noting that there was "no indication in this case ... that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application."); *Emeronye,* 141 F.Supp.2d at 86 n. 5 ("Moreover, the fact that plaintiff had a legal education and two law degrees supports that plaintiff should be bound by the terms of the contract she signed.") (citing *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 957 F.Supp. 1460, 1477 (N.D.Ill.1997)). Here, plaintiff was educated at two of the most prestigious universities in the United States, had

seven years of experience as a practicing attorney, and had been employed by two law firms when she signed the Employment Agreement with the defendant. Def.'s Reply, Ex. A (Resume of Patricia Russell Brown). While not dispositive, the Court finds that plaintiff's education and extensive experience in the legal profession support the conclusion that she assented to be bound by the terms of the defendant's dispute resolution policy despite the fact that she did not take the opportunity to actually read the policy.

### III. Conclusion

For the reasons set forth above, the plaintiff must submit her claims to binding arbitration and this action is dismissed.[13]

**SO ORDERED** on this 12th day of June, 2003.[14]

---

**13.** Dismissal, not a stay pending the completion of the arbitration process, is warranted here. *See Nelson,* 215 F.Supp.2d at 158 ("While the FAA provides that once arbitration is compelled by a district court it 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement,' 9 U.S.C. § 3, this Court concludes that this matter should be dismissed because neither party has requested that these proceedings be stayed, and dismissal is also in accordance with what other courts have done when all of the plaintiff's claims must be submitted to arbitration.") (citations omitted).

**14.** An order consistent with the Court's rulings accompanies this Order.